**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

SHAWNTE ANNE LEVY, #416-369          *

         Plaintiff,          *

   v.          *          Civil No. TDC-18-1291

DAYENA CORCORAN, *Commissioner, et al*          *

       Defendants.          *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, IN THE
ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

Defendants, former Commissioner Dayena Corcoran and Medical Director Sharon Baucom, by their attorneys, Brian E. Frosh, Attorney General of Maryland and Dorianne A. Meloy, Assistant Attorney General, in support of their Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, file this Memorandum of Law and state as follows:

## I.     INTRODUCTION

Plaintiff is a Division of Correction inmate presently housed at the North Branch Correctional Institution (NBCI) in Cumberland, Maryland. Plaintiff filed suit on May 2, 2018 and complains she has been subjected to deliberate indifference to a serious medical need as well as cruel and unusual punishment. Plaintiff is requesting that she have sex reassignment surgery (SRS), female compression under garments and other clothing items, and a transfer to correctional institution for women. ECF 1. Plaintiff filed suit against Defendant, former Commissioner Corcoran and Medical Director Doctor Sharon Baucom in their individual and official capacity. *Id.* Plaintiff requests injunctive relief. ECF 1. For the reasons provided below,

Plaintiff has failed to state a claim upon which relief can be granted, or judgment should be granted in favor of Defendants.

## II.   FACTUAL BACKGROUND

On May 2, 2018, Plaintiff filed the complaint alleging that she was being denied adequate medical care for gender dysphoria. ECF 1. Plaintiff is has a comorbid diagnoses which includes a diagnosis for Gender Identity Disorder. *See*, Attachment 1, Shawnte Anne Levy v. Wexford Medical Health Care Provider, et al, TDC 14-3678, ECF 46-1 (D. Md.), ¶4. Defendant Dayena Corcoran (Corcoran) is retired. Exhibit 1, Declaration of Ebone' Janifer dated September 7, 2018. Defendant Dayena Corcoran was the Acting Commissioner of Correction from April 8, 2016 – May 16, 2016. *Id.* On May 17, 2016-August 31, 2018, she was the Commissioner of Correction. *Id.*

Dr. Sharon Baucom (Baucom) is the Director of Clinical Services for the Maryland Department of Public Safety & Correctional Services (DPSCS). Exhibit 2, Declaration of Sharon Baucom and attachments. She has held that position for more than twelve years. *Id.* As Director, she is an administrator. *Id.* She does not practice medicine or provide direct medical care to Maryland Division of Correction inmates. *Id.* As an administrator, she reviewed procedures and updates as needed annually and formally establish these processes to be acceptable to DPSCS. *Id. See* Attached DPSCS, Clinical Services & Inmate Health, Operations Manuals cover page (Reviewed 2/20/2016). *Id.,* p.4.

The Maryland Department of Public Safety and Correctional Services provides medical care to inmates housed within its facilities through private health care contractors. *Id.* She does not have supervisory authority over the private medical contractors' staff. *Id.* The medical contractors' staff has their own statewide medical director whom they report to directly. *Id.* She

does not deny nor approve procedures recommended by the Wexford regional medical provider for approval unless they violate DPSCS clinical policy or clinical procedure/processes. *Id.* In which case, she may directly contact the Wexford statewide medical director and request that he review the case or procedure and follow DPSCS policy or procedure. *Id.*

The Commissioner of Correction does not have the authority to make clinical decisions regarding the care provided for inmates or direct the Wexford provider to take a clinical action on behalf of an inmate. *Id.* COMAR 12.14.05.02 D, which states that "The Managing official shall have a written policy specifying that matters of medical, psychiatric, and dental judgement are the province of qualified health care personnel; and not subject to interference by facility personnel unless necessary to maintain order and security." *Id.* "Clinical Services will work with Custody officials to assure compliance with security and safety of staff and inmates/detainees, but retain the sole right to the direction of patient care. *Id.*

Plaintiff, as an inmate at a Maryland correctional institution, has available to her medical care provided through the private health care contractors with recommendations from the Gender Dysphoria Committee (*See*, Attached Gender Dysphoria Committee Meeting Minutes, p. 24-25 and OPS.131.0001 Revised (eff. September 26, 2016), pp. 12-23. *Id.* Baucom does not serve on the committee, nor does she make direct recommendations to the committee regarding the care of the inmates reviewed by the committee. *Id.* The DPSCS Gender dysphoria Committee membership does include a Johns Hopkins Specialist in gender dysphoria, Ph.D. psychologists, and psychiatrists who are directly involved in providing care and treatment for Plaintiff. *Id.* Wexford Health provides off site specialty care consultation through a Utilization Management precertification process. *Id.* Wexford provides that service through a Director of Utilization Management, who is a physician. *Id.* She has not received any recommendation by the Gender

Dysphoria Committee for Plaintiff to have sex reassignment surgery. *Id.* Baucom has been advised that Plaintiff will be paneled by the Gender Dysphoria Committee at the next meeting to be held on November 2, 2018, for the purpose of determining suitability for sex reassignment surgery from a mental health perspective. *Id.*

Plaintiff receives hormonal therapy. *Id.* Plaintiff's hormonal therapy is provided by Wexford Health Sources, Inc. staff and is done in consultation with the University of Maryland Medical Systems' endocrinologist. *Id.* Hormonal feminizing medications are not considered irreversible. *Id.* Hormones can be stopped at any time without clinical harm to a patient. *Id.* Plaintiff is not permanently and irreversibly feminized secondary to hormones. *Id.* Secondary sexual characteristics of a male will be restored once female hormone therapy is stopped. *Id.*

Baucom has not been involved in the housing determination of Plaintiff and final determination of housing placement is the responsibility of the managing official. *Id.* Section C, Transgender Detainees/Inmates of the DPSCS, Office of Clinical Services/Inmate Health, Medical Evaluations Manual, Chapter 1, Medical Intake states that incomplete surgical gender reassignment require that the patient be classified according to his or her birth sex for purposes of prison housing, regardless of how long they may have lived their life as a member of the opposite gender. *Id.,*p.6. Inmates with completed surgical gender reassignment are generally classified and housed according to their sex. *Id.,*p.7. As DPSCS Director of Clinical Services, pursuant to OPS.131.0001 Revised, Identification, Treatment and Correctional Management of an Inmate Diagnosed with Gender Dysphoria, OPS.131.0001.J.(1) states a Gender Dysphoric inmate's housing placement shall be made on a case-by-case basis seriously considering the inmate's opinion regarding the inmate's safety and the inmate's biological gender presentation and appearance concerning: (a) intact external genitalia and secondary sex characteristics, such

4

as pubic hair, chest hair, facial hair; and specific facts such as partial completion of sex reassignment surgery, removal or augmentation of breasts, or removal of testicles. *Id.*, p. 22. OPS.131.0001.5.J.(2) states each inmate shall be evaluated on a case-by-case basis by the facility's security Chief and Case Management staff with support from Director, Clinical Services, and Deputy Director of Mental Health or specialty consultation considering safety, security, or operation issues. *Id.* OPS.131.0001.5.J.(3) states Mental Health staff may provide input as to clinical recommendations related to housing of a Gender Dysphoric inmate to the managing official and Case Management staff as part of the Regional Treatment Team's individualized treatment plan, however, final determination regarding housing placement is the responsibility of the managing official. *Id.*

A search of the available record for the Headquarters ARP/IGP Unit for Plaintiff did not produce any record of an ARP appeal concerning sex reassignment surgery. Exhibit 3, Records Declaration of Kristina Donnelly; Exhibit 4, Declaration of Ebone' Janifer. A search of the available record for the Headquarters ARP/IGP Unit for Plaintiff did not produce any record of an ARP appeal concerning NBCI ARP 2906-17, NBCI ARP 2680-17 or NBCI ARP 0810-16. Exhibit 4. A review of the records of the Inmate Grievance Office (IGO) has determined that Plaintiff has filed four grievances with the IGO. Exhibit 5, Declaration of Samiyah Hassan. IGO No. 20141093, filed with the IGO on May 20, 2014, as an "appeal" from the disposition of ARP-NBCI-0946-14, in which Plaintiff complained that she has been diagnosed with gender identity disorder and has been denied the transgender medical health care and treatment to which she claims she is entitled. *Id.* This grievance was administratively dismissed effective at the close of business on January 7, 2015, when Plaintiff failed to respond to a letter from the IGO, dated December 8, 2014, requesting that she provide the supporting documentation required by

COMAR 12.07.01.04(B)(9)(a) and granting her 30 days within which to do so. *Id.* IGO No. 20161103 was filed on June 29, 2016 as grievance appeal of the disposition of ARP-NBCI-08 I 0-16 in which Plaintiff complained Keefe Commissary and NBCI denied her access to order feminine items such as: lipstick, eyeliner, makeup etc. *Id.* This grievance was administratively dismissed effective at the close of business on September 12, 2016, when Plaintiff failed to respond to a letter from the IGO, dated August 11, 2016, requesting that she provide the supporting documentation required by COMAR 12.07.01.04(B)(9)(a) and granting her 30 days within which to do so. *Id.* IGO No. 20171804 was filed on December 4, 2017 as grievance appeal of the disposition of ARP-NBCI-2680-17 in which Plaintiff complained that she identifies as a transgender female and consequently, should be classified by the Division of Correction as female. *Id.* This grievance is pending further review, no administrative decision has been issued. *Id.* IGO No. 20180102 was filed on January 10, 2018 as grievance appeal of the disposition of ARP-NBCI-2906-17 in which Plaintiff sought gender reassignment surgery. *Id.* This grievance was administratively dismissed by the IGO on March 1, 2018, as beyond the jurisdiction of the IGO, because it constituted a complaint against contract medical staff and not officials or employees of the DOC or Patuxent Institution as well as Plaintiff failed to provide any ARP appeal to the Commissioner of Correction or receipt/response from the Commissioner of Correction. *Id.*

Plaintiff has submitted order forms to order women's items to include sports bras and women's panties since August 24, 2016. Exhibit 6, Declaration of Ansel Shircliffe, Correctional Supply Officer. Plaintiff has submitted order forms to order women's items to include sports bras and women's panties since August 24, 2016. *Id.* The last order placed by Plaintiff was for three (3) pairs of "SZ 10  WOMENS PANTIES" on August 29, 2018. *Id.* However, OPS.220.0004,

Appendix 1 Allowable Inmate Property Matrix stipulates that female inmates are only permitted to own "State Issued" bras. *Id.* When Plaintiff submitted the requests to order bras the orders were returned to Plaintiff for resubmission without the request to order bras. *Id.* Plaintiff was permitted to purchase men's compression shorts, however, Shircliffe was informed by Mr. Bruce Liller that Plaintiff did not want to order them because they were men's and they were expensive, so Plaintiff would not wear them. *Id.* Plaintiff is permitted to order Item # 0036 (Dark and Lovely Hair Relaxer Kit) and Item # 0106 (Antiperspirant Deodorant Women) from Tab 4 "GP Menu Pg. 4" of the Maryland DPSCS State Wide General Population Menu. *Id.* Maryland Correctional Institution – Women's makeup was not approved by the NBCI Chief of Security for Plaintiff to order. *Id.* Plaintiff would be permitted to order items numbered 6030 (Maruchan Inst. Lunch Chicken (Cup)), 6031 (Maruchan Inst. Lunch Shrimp (Cup)), 6036 Hot & Spicy Beef Flavor (Cup)), 2085 (Sugar Cubes (Box)), 3500 Beautiful Blossom Honey) , 0533 (Ultra Brite Toothpaste), 0623 (Next 1 Bar Soap Almond), 1200 (AAA Ion3 Alkaline Batteries), 1210 (AA Ion 3 Battery), 0018 (Panteen Pro V Shampoo), 0264 (Dandruff Shampoo Almond/Shea), 1476 (Wisk Laundry Detergent (S.S.)), and 5217( Gain Laundry Detergent (HE)), but their availability may be limited due to stock from the vendor. *Id.* These items are on the DPSCS State Wide General Population Menu. *Id.* Item 0407, Lever soap, was removed from the menu and is no longer available. *Id.* Gray T-shirts are not provided by DPSCS; only white t-shirts. *Id.* Males and females are permitted to purchase white or gray t-shirts DPSCS wide. *Id.* Therefore, Plaintiff would be permitted to order gray T-shirts at any male or female facility in DPSCS, but Plaintiff has not ordered any to date. *Id.* This is outlined in OPS.220.0004, Appendix 1. OPS.220.0004 was made effective on December 30, 2016. *Id.* Under .07 History, A. reads that "this Directive replaces DOC.220.0004 dated 09/04/15 by updating the Allowable Inmate Property Matrix

7

concerning make up and sewing kits. *Id.* Also, B. reads "This directive supersedes provisions of any other prior existing Department or unit communication with which it may be in conflict." *Id.* The last page of OPS.220.0004 and last paragraph stipulates that "An inmate (male or female) may not possess or wear face or body make-up (includes items specifically manufactured as or other substances modified to be) items such as, lip stick, rouge, eye liner, eye shadow, mascara, face or body paint, or fingernail polish." *Id.* Plaintiff would not be permitted to order makeup whether he is housed in a male or female facility. *Id.* Plaintiff is able to order thermal underwear, tops and bottoms, in either white or gray per the Allowable Inmate Property Matrix in OPS.220.0004. *Id.* However, Plaintiff has not submitted an order form to purchase these items from an outside vendor. *Id.* OPS.131.0001.5.K states that consistent with security level a Gender Dysphoric inmate :(2)(a) Whose assigned gender is male and expressed gender is female an who is housed in a male facility is permitted to purchase and retain clothing items and other articles authorized for other male inmates at he facility, as well as items authorized for females at a female facility; …(c) may only purchase and retain personal property and commissary items that are authorized by established policy and procedures related to allowable inmate personal property. Exhibit 2, p.23. All attached records have been certified as true and accurate copies. Exhibit 2.

## III.    STANDARD OF REVIEW

### A.    Motion to Dismiss

A court reviewing a complaint in light of a Rule 12(b)(6) motion accepts all well-pled allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006); *Ibarra v. United States*, 120 F.3d 472 (4th Cir. 1997). Such a motion

8

should be granted when the plaintiff has failed to plead facts that plausibly suggest that he is entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Indeed, the plaintiff must make allegations that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). The court, however, need not accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), or conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

### B.      Motion for Summary Judgment

A motion for summary judgment may be granted if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson,* 477 U.S. at 256.

In *Celotex Corp.,* the Supreme Court stated:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex Corp.*, 477 U.S. at 324. However, "a mere scintilla of evidence is not enough to create a fact issue." *Barwick v. Celotex Corp.,* 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. N. Carolina Theatres, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966) *aff'd,* 388 F.2d 987 (4th Cir. 1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted). Based upon this standard, the pleadings and exhibits, the Defendants are entitled to summary judgment.

## IV.   ARGUMENT

### A.   Defendants Are Immune.

The Eleventh Amendment provides that federal "judicial power" does not extend to suits against the states. The Eleventh Amendment has long been interpreted as barring lawsuits brought by private parties against the states, its agencies and departments, in federal court, unless it consents. *See Hans v. Louisiana*, 134 U.S. 1 (1890); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-202(a) (1995 Repl. Vol.), it has not waived its immunity under the Eleventh Amendment to suit in federal court. Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). It is likewise well-established that the Eleventh Amendment bars federal court actions against the agencies and departments of the state, as well as the state itself. *Pennhurst State Sch. & Hosp.*, 465 U.S. at 100-01; *Alabama v. Pugh*, 438 U.S. 781, 782 (1978).

Also barred by the Eleventh Amendment are claims brought against state employees in their official capacity because a suit against a state officer in his official capacity is tantamount to a suit against the state itself. *Brandon v. Holt,* 469 U.S. 464, 471-72 (1985). To the extent that Plaintiff sues the Defendants in their official capacity,

> the state is the real, substantial party in interest. . . . Thus, "[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." . . . And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief. . . .

*Pennhurst State Sch. & Hosp.*, 465 U.S. at 101-02 (citations omitted).

Plaintiff requests injunctive relief against Defendant Corcoran who is no longer employed by DPSCS. Further, as argued *supra*, there are no on going federal constitutional violations committed by the Defendants such that Plaintiff would be entitled to prospective injunctive relief. Therefore, Defendants should be dismissed in their official capacity and individual capacity.

**B.    Plaintiff Has Failed To Allege Sufficient Facts To State A Claim.**

"[W]here the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted." *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999) *aff'd sub nom. Dove v. O'Hare*, 210 F.3d 354 (2d Cir. 2000) (quoting *Morabito v. Blum*, 528 F. Supp. 252, 262 (S.D.N.Y. 1981)); *Zavatsky v. Anderson*, 130 F. Supp. 2d 349, 358 (D. Conn. 2001) (complaint naming two defendants only in the caption was dismissed as to those two defendants); *Polk v. Montgomery Cnty., Md.,* 548 F. Supp. 613, 614 (D. Md. 1982) (reversed on other grounds). "Further, even a pro se plaintiff has the burden of alleging sufficient facts upon which a recognized legal claim could be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir.

11

1996); *Allison v. Utah Cnty. Corp.*, 223 F.R.D. 638, 639 (D. Utah 2004). In order for liability to exist under § 1983, there must be personal involvement by the defendant in the alleged violation. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994); *see also Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976). Liability under §1983 is "personal, based upon each defendant's own constitution violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001)(citations omitted).

There is no *respondeat superior* liability under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials must be "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Therefore, supervisory correctional officials can be held liable only for their own personal wrongdoing or for supervisory actions that themselves violate constitutional norms. To establish supervisory liability in a § 1983 action, the Fourth Circuit has held that it must be evidence showing:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799 (citations omitted). *See also Slakan*, 737 F.2d at 373. In order for liability to exist under § 1983, there must be personal involvement by the defendants in the alleged violation. *Shaw*, 13 F.3d 791. *See also, Vinnedge*, 550 F.2d at 928; *Rizzo*, 423 U.S. at 370-71. Therefore, Defendants Corcoran and Baucom are entitled to dismissal of the complaint.

12

**C.  Plaintiff Has Not Be Subjected To An Unconstitutional Denial Of Medical or Mental Health Care.**

To state a claim for denial of medical care a prisoner must meet a two-part test by alleging facts from which a trier of fact could find that the defendants' acts or failures to act amounted to deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There is no essential distinction between the right to medical care for physical ailments and the right to psychiatric or psychological care for mental ailments. *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977). First, the plaintiff must demonstrate the existence of a serious medical or mental health condition. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The right to medical and mental health treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977). A "serious medical need" is one which a physician has found requires treatment or one that is "so obvious that even a lay person would easily recognize the need for a doctor's attention." *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999).

Second, the plaintiff must show that the defendant acted with deliberate indifference. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). Deliberate indifference occurs when a defendant actually "knows of and disregards an **excessive** risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)(emphasis added). *See also Young v. City of Mount Ranier*, 238 F.3d 567, 576 (4th Cir. 2001). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999). The plaintiff's disagreement with a prescribed course of treatment does not establish deliberate indifference and therefore does not state a claim. *Peterson v. Davis*, 551 F. Supp. 137, 146 (D. Md. 1982) *aff'd,* 729 F.2d 1453 (4th Cir. 1984). Likewise, claims of medical negligence or

13

disputed questions of medical judgment are not cognizable, because they do not involve deliberate indifference. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (questions of medical judgment are not subject to judicial review).

Supervisory prison officials cannot be held liable merely for actions or failures to act on the part of the medical or mental health staff. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). Rather, supervisory officials can only be liable where it is shown they either failed to timely provide needed care, deliberately interfered with doctors' performance or tacitly authorized or were deliberately indifferent to prison physicians' constitutional violations. *Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990); *Rogers v. Evans*, 792 F.2d 1052, 1059 (11th Cir. 1986). Prison officials are entitled to rely on the professional medical judgment of health care providers employed by the prison to care for inmates. *Miltier*, 896 F.2d at 854-55. *See also Olmstead v. L.C. by Zimring*, 523 U.S.581, 603 (1999) ("[T]he State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation.")

It is likewise not enough to allege in a conclusory way that officers acted with deliberate indifference, acted maliciously or wantonly. "The presence . . . of a few conclusory terms does not insulate a complaint from dismissal under Rule 12(b) (6) when the facts alleged in the complaint cannot support a finding of deliberate indifference." *Young*, 238 F.3d at 578. Accordingly, a plaintiff must supply "hard evidence" of an unnecessary and wanton infliction of pain which has resulted in serious medical or emotional deterioration. *Lopez v. Robinson*. 914 F.2d 486 (4th Cir. 1990).

Here, there is no hard evidence that Defendants were deliberately indifferent to Plaintiff's medical or mental health needs. Nor is there evidence that Plaintiff's condition was ignored.

14

When it appears from the entire record that prison medical or mental health authorities have made a sincere and reasonable effort to handle the plaintiff's medical and mental problems, plaintiff's constitutional rights have not been violated. *Bennett v. Reed*, 534, F. Supp. 83, 87 (E.D.N.C. 1981) *aff'd*, 676 F.2d 690 (4th Cir. 1982).

Plaintiff merely disagrees with her treatment plan. Plaintiff has a comorbid diagnosis. A thorough diagnostic evaluation has been conducted for gender dysphoria and Plaintiff is receiving both medical and mental health treatment. Plaintiff provided to the court a January 11, 2018 endocrinologist report (ECF 1-3) in support of her request to enjoin the Defendants from interfering with the discretion of the endocrinologist and medical professional involved in Plaintiff's hormonal therapy and sex reassignment surgery and to allow access to appropriate specialist for sex reassignment surgery. However, Plaintiff's misconstrues the report as requiring sex reassignment surgery by DPSCS without further evaluation by mental health professionals. The report recommended psychiatric evaluation for depression and prior notes indicated Plaintiff was recommend for evaluation by Dr. Chris Kraft PHD-Director of clinical services for sexual behavior consultation unit of psychiatry of Johns Hopkins School of Medicine. ECF 1-3, p. 1-2.

Further, Plaintiff's case was reviewed by DPSCS' gender dysphoria consultant including the provision of treatment for hormonal therapy and male compression undergarments were monitored and recommended. Dr. Holwager recommended Plaintiff be allowed to wear a sports bra. *See*, Attachment 1, Shawnte Anne Levy v. Wexford Medical Health Care Provider, et al, TDC 14-3678, ECF 46-1 (D. Md.), ¶7. Dr. Baucom has not received a recommendation from the Gender Dysphoria committee for sex reassignment surgery. DPSCS records reflect that there is no record of Plaintiff sending an ARP appeal requesting sex reassignment to Corcoran. The Inmate Grievance Office (IGO) response indicated that Plaintiff had not provided as required a

copy of the Headquarters' ARP appeal. ECF 1-6. Nor has Plaintiff provided a copy to this court. ECF 1. Further, the Commissioner of Correction does not play an active individual part in the provision of medical care or mental health care for any individual inmate by policy and medical autonomy direct medical care of mental health care of an inmate. *See*, Attachment 1, Shawnte Anne Levy v. Wexford Medical Health Care Provider, et al, TDC 14-3678, ECF 46-1 (D. Md.), ¶8. The Gender Dysphoria committee will meet on November 2, 2018 to review Plaintiff's request for sex reassignment surgery. Consequently, Defendants have not been deliberately indifferent to a serious medical or mental health need and are entitled to judgment in their favor.

### D. Plaintiff's Complaint Regarding Housing And Commissary Fails To State A Claim.

A classification decision or a transfer from one prison facility to another does not ordinarily implicate a protected liberty interest or state a claim under § 1983. *Meachum v. Fano*, 427 U.S. 215 (1976); *Paoli v. Lally*, 812 F.2d 1489, 1492-93 (4th Cir. 1987). A prisoner has no liberty interest in being housed in any particular facility or on a particular status. *See Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983). *Wetzel v. Edwards*, 635 F.2d 283 (4th Cir. 1980), is illustrative of the federal court's view of prison management, especially regarding the security classification of prisoners. In *Wetzel*, the Fourth Circuit reversed the district court's grant of a preliminary injunction ordering the transfer of an inmate to a medium security prison against the State's decision that the inmate warranted housing in a maximum security facility. The Fourth Circuit stated:

> Thus, the prison administrators denied Wetzel's transfer based on their informed discretion as penal administrators. The realities of running a penal institution are complex and unique to the prison environment. Federal courts have traditionally been reluctant to interfere in the problems of prison administration. Indeed, the decisions made by prison administrators in their informed discretion have been accorded "wide-ranging deference" by the federal courts. *Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126, 97 (1977). Moreover, as long as

> prison authorities are rationally pursuing a legitimate penological objective, the administrator has the "last word." *Pittman v. Hutto*, 594 F.2d 407, 412 (4th Cir. 1979). Judicial recognition that courts are ill-equipped to deal with problems of prison administrators " . . . reflects no more than a healthy sense of realism." *Procunier v. Martinez*, 416 U.S. 396, 405 (1974).

*Wetzel*, 635 F.2d at 288. Moreover, it is beyond cavil that inmates are not entitled as a matter of constitutional law to be housed at any particular security classification or prison. *Slezak v. Evatt*, 21 F.3d 590 (4th Cir. 1994). Courts have further held that there is no constitutional right for a biological male inmate to wear women's clothing. *See Brown v. Godinez*, 2015 U.S. Dist. LEXIS 27012 at *6 (S.D. Ill. March 5, 2015). The housing determination is made by the managing official. "Managing official" means the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility. *See*, Correctional Services Article 1-101, Annotated Code of Maryland (eff. 1999 Repl.Vol.).

To establish a denial of equal protection of the laws, an inmate must show that similarly situated persons are intentionally treated differently without a sufficient basis. *United States v. Roberts*, 915 F.2d 889, 891 (4th Cir. 1990), *cert. denied*, 498 U.S. 1112 (1991). *Accord, In Re Five Percenters*, 174 F.3d 464, 471 (4th Cir. 1999). Differential treatment in and of itself does not state an equal protection claim in the absence of a showing that the inmate was similarly situated to those treated differently, *see Moss v. Clark*, 886 F.2d 686, 691 (4th Cir. 1989), for the Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike." *The City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *Sheppard v. Early*, 108 F.3d 689, 691 (4th Cir. 1999).

After establishing that he was treated differently than others similarly situated, the inmate must next show that there was an insufficient basis for the differential treatment. Where neither fundamental rights nor suspect classifications, such as race, are involved, intentionally different treatment does not deny equal protection if the distinction drawn by prison officials is rationally

related to a legitimate state interest. *Moss v. Clark*, 886 F.2d at 690. Most importantly, even where the plaintiff has shown he was treated differently than others similarly situated without any rational basis, the plaintiff must also show that the defendant acted with a discriminatory purpose. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). The mere showing of a discriminatory effect is not enough to establish an equal protection violation. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Auth.*, 429 U.S. 252, 265-66 (1977). Bald and conclusory allegations of discriminatory intent are insufficient to state an equal protection claim. *Beaudette v. City of Hampton*, 775 F.2d 1274 (4th Cir. 1975), *cert. denied*, 475 U.S. 1088 (1986). Plaintiff's claims are utterly devoid that she is treated differently than similarly situated inmates or that there is any discriminatory intent. Plaintiff provides no legal support for her claim that the mere changing of Plaintiff's sex from male to female on a reissued birth certificate provides her with constitutional mandate to be housed in a female correctional institution, to be classified as female, or to be allowed to order items available to female inmates. Plaintiff fails to state a claim upon which relief can be granted and the defendants are entitled to dismissal of the complaint or, in the alternative, judgment in their favor.

**E.   A Mere Violation Of Defendant's Own Policies, Procedures, Rules, Regulations Or State Law, Does Not Provide A Basis For A Due Process Violation.**

To the extent that Plaintiff's complaint is intended to be construed as an allegation that the defendants violated their own policies, procedures, rules, regulations or state law, a mere violation of State law or regulation does not provide a basis for a due process violation. *See, e.g. Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("Just as '[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner,' false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state

18

official."); *Riccio v. Cnty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("[i]f the state law grants more procedural rights than the Constitution would otherwise require, a State's failure to abide that law is not a federal due process issue"); *Clark v. Link*, 855 F.2d 156, 163 (4th Cir. 1988) ("a section 1983 claim can only be sustained by allegations and proof of a violation of the Constitution or statutes of the United States and specifically may not rest solely on a violation of state statutes or qualify as a common law tort"). Further, Plaintiff fails to provide any support that her desire to order specific type of bra, or other commissary items is medically necessary. Plaintiff fails to state a claim upon which relief can be granted and the case should be dismissed.

### F.     Plaintiff Has Failed To Properly Exhaust Her Administrative Remedies.

The Prison Litigation Reform Act (PLRA) generally requires prisoners to pursue their administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F. Supp. 2d 523, 530 (D. Md. 2003) aff'd, 98 F. App'x 253 (4th Cir. 2004); *Gibbs v. Bureau of Prison Office*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *Booth v. Churner,* 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"). 42 U.S.C. § 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *See also Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). The Supreme Court has interpreted this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other

wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The Supreme Court has emphasized that proper exhaustion of administrative remedies is required. *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Proper" exhaustion means "using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Id.* at 90 (*quoting Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original)). Proper exhaustion "demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91. Proper exhaustion has been mandated by Congress; therefore, it is not a requirement subject to the discretion of the presiding judge. *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); Woodford v. Ngo, 548 U.S 81, B5 (2006). To exhaust administrative remedies within the meaning of 42 U.S.C. §1977e(a), the inmate must pursue his administrative remedies to the highest available level and received a final denial of his claims on the merits at the agency's appellate level. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006) ("Administrative law . . . require[es] proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" (citation omitted) (emphasis in original)); *Maulick v. Central Classification Board*, 659 F. Supp. 24, 27 (E.D. Va. 1986). *Ross v. Blake*, 136 S. Ct. 1850 (2016). Exhausting administrative remedies after a Complaint is filed will not save a case from dismissal for failure to exhaust administrative remedies. *See, Neal v. Goord*, 267 F.3d 116, 121-22 (2d Cir. 2001)(overruled on other grounds)(a Section 1983 action, citing numerous cases). Allowing prisoner suits to proceed, so long as the inmate eventually fulfills the exhaustion requirement, undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court. *See, Neal*, 267 F.3d at 123. Moreover, if during the pendency of a

suit, the administrative process were to produce results benefitting plaintiff, the federal court would have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset. *Id.* Further,  in *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999), the Court stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court. . . .The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." Thus, the PLRA requires that available administrative remedies must be exhausted before the filing of a suit in Federal Court.

In Maryland, filing a request for administrative remedy with the warden of the prison is the first of three steps in the ARP process. *See* COMAR 12.07.01.04. The ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the inmate first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.07.01.05A. If the request is denied, a prisoner has 30 calendar days to file an appeal with the Commissioner of Correction. COMAR 12.07.01.05C. If the appeal is denied, the prisoner has 30 days to file a grievance with the Inmate Grievance Office. *See* Md. Code Ann.,Corr. Servs. §§ 10-206, 10-210; COMAR 12 07.01.03; COMAR 12.07.01.05B. Complaints are reviewed preliminarily by the IGO. *See* Md. Code Ann., Corr. Servs. §10-207; COMAR 12.07.01.06A. If a complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. Md. Code Ann., Corr. Servs. § 10-207(b)(1); *see* COMAR 12.07.01.07B.

Plaintiff did not properly complete all three steps of the administrative process prior to filing suit. Plaintiff did not provide the appropriate paperwork concerning her claims for commissary items, clothing, and housing transfer. Plaintiff request for classification as a female is pending. Although the IGO dismissed Plaintiff's request for sex reassignment surgery,

21

Plaintiff failed to submit an appeal to Commissioner Corcoran; thereby, circumventing the Commissioner of Correction's opportunity to respond to the administrative remedy procedure request at that level. Plaintiff failed to respond to the IGO correspondence requesting that Plaintiff submit additional materials. Having failed to properly pursue his claim to all levels of review, Plaintiff has failed to properly exhaust all available administrative remedies, and the complaint should be dismissed.

G.      **Plaintiff Is Not Entitled to Injunctive Relief.**

Absent the most extraordinary circumstances, a federal court should not issue an injunction against a State prison concerning prison management. The Supreme Court has repeatedly emphasized that prison administrators, and not the federal courts, must "manage penal institutions." The Court recognized that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning and the commitment of resources, all of which are peculiarly within the province of the Legislative and Executive Branches of Government." *Turner v. Safley,* 482 U.S. 78, 84-85 (1987). An essential objective in the administration and management of a prison is "maintaining institutional security and preserving internal order and discipline." *Bell v. Wolfish,* 441 U.S. 520, 546 (1979). Critical to that goal, prison officials must be given "wide ranging deference" in pursuing legitimate penological concerns. *Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126 (1977); *see also Taylor v. Freeman*, 34 F.3d 266, 268 (4th Cir. 1994) (no federal injunction against State prisons "absent the most extraordinary circumstances" and federal courts should not immerse themselves in prison management).

In *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 32-33 (2008), the Supreme Court noted that their analysis of the propriety of issuing preliminary injunction is

applicable to any permanent injunction as well. The Court also cautioned that the issuance of a permanent injunction is an "extraordinary remedy never [to be] awarded as a right." *See Winter*, 555 U.S. at 24. The Supreme Court has expounded four requirements that a plaintiff must establish in order to obtain a permanent injunction: (1) that he has suffered an irreparable injury; (2) that remedies available at law… are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006); *see Cantley v. West Virginia Regional Jail*, 771 F.3d 201, 207 (4th Cir. 2014) (noting that *Ebay, Inc.* provides the standard for permanent injunctions). All four of the requirements must be established individually. *Winter*, 555 U.S. at 32-33; *see Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013).

Both the Supreme Court and Fourth Circuit have emphasized that courts must consider the public interest impact of injunctions. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)); *Real Truth About Obama, Inc. v. Federal Election Com'n*, 575 F.3d 342, 347 (4th Cir. 2009). Indeed, in *Winter*, the Supreme Court reversed the Ninth Circuit because it had "understated" the public interest burden that would occur if an injunction is granted. *Winter*, 555 U.S. at 24. As with any other federal case, an actual controversy must exist in a § 1983 action at all times or the case must be dismissed as moot. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997)("To qualify as a case fit for federal court adjudication, an actual controversy must be extant at all stages of review...."); *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974)("The rule in federal cases is that an actual controversy must be extant at all stages of

review, not merely at the time the complaint is filed."). *See also County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979).

Where only injunctive relief is requested, intervening events can render a case moot. *See, e.g., National Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 350 (D.C. Cir. 1997)(change in statute); *Tawwab v. Metz*, 554 F.2d 22, 23 (2d Cir. 1977)(change in policy); *Gross v. Pomerleau*, 465 F. Supp. 1167, 1174 (D.Md. 1979) ("Section 1983 actions seeking injunctive and/or declaratory relief have been declared moot when the practices, procedures, or regulations challenged were no longer in use."); *Stevenson v. Lanham*, 127 Md. App. 597, 625, 736 A.2d 363, 379 (1999)(action seeking declaratory and injunctive relief relating to power to feed inmate on hunger strike rendered moot by inmate's decision to begin eating). As Plaintiff is receiving mental health care for Gender Dysphoria Disorder and access to allowable commissary items these matter are moot. Plaintiff has failed to meet his burden to support her motion injunctive relief. Based on the facts and arguments, *infra*, Plaintiff is not entitled to injunctive relief.

## V.   CONCLUSION

Defendants respectfully request that this Court dismiss the case or that summary judgment be entered in their favor.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

_____/s/_____
DORIANNE A. MELOY
Assistant Attorney General
Federal Bar No. 16323

St. Paul Plaza - 19th Floor
200 St. Paul Place
Baltimore, Maryland 21202
(410) 576-6429 (Telephone)
(410) 576-6880 (Telefax)
E-mail: dmeloy@oag.state.md.us

Attorneys for Defendants