## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SHAWNTE ANNE LEVY,           :
                           :

          Plaintiff,         :

     v.                        :
                           :

ROBERT L. GREEN, *Secretary for State of*  :  Civil Action No.: TDC-18-1291
*Maryland Department of Public Safety and*  :
*Correctional Services*,            :
PAT GOINS-JOHNSON,         :  **ORAL ARGUMENT REQUESTED**
J. MICHAEL ZIEGLER,
RANDALL S. NERO,
CHRISTOPHER KRAFT, and
DOES 1-25.

          Defendants.

## SHAWNTE ANNE LEVY'S
## <u>OPPOSITION TO DEFENDANT KRAFT'S MOTION TO DISMISS</u>

WILLIAMS & CONNOLLY LLP
680 Maine St.
Washington, DC 20024
Tel: (202) 434-5083

*Attorneys for Plaintiff Shawnte Anne Levy*

# INTRODUCTION

Shawnte Anne Levy is a 61-year-old transgender woman in the custody of the Maryland Department of Public Safety and Correctional Services ("the Department"). Levy was designated male at birth, but has been interested in transitioning since childhood. She was diagnosed with gender dysphoria—psychological distress resulting from the incongruence between one's assigned sex at birth and their gender identity—in 1984, almost 40 years ago. In 2014, she sued the Department for failing to provide her with female hormone replacement therapy. *Levy v. Wexford Med. Sources, Inc.*, 2017 WL 3431951 (D. Md. Aug. 9, 2017). The Department conceded that their policy "obligate[d] them to provide Levy treatment" and prescribed Levy female hormones starting in January 2016. *Id.* at *10. Levy has been on female hormones ever since, but the defendants have unlawfully prevented her from receiving the full course of treatments called for by the well-established Standards of Care. This suit seeks to set that right and to obtain for Levy the treatments that are medically – and legally – required.

In 2018, Maryland recognized Levy's legal status as a woman, and issued her a female birth certificate. Am Compl. at ¶¶ 1, 2; Ex. 2a.[1] But despite Levy's legal status as a woman and her being on female hormones for 7 years, the Department and Defendant Christopher Kraft, who consults for the Department as its "Gender Dysphoria Consultant," have failed adequately to medically assess Levy or permit her to move forward with sex reassignment surgery. As a result,

---

[1] A court may consider documents that are "attached to" or "incorporated into the complaint by reference" as long as they are "integral to the complaint" and "authentic." *Schneider v. Donaldson Funeral Home, P.A.*, 733 F.App'x 641, 645 (4th Cir. 2018), *as amended* (May 9, 2018).

Levy suffers from continuous distress, and a desire to self-castrate. Indeed, she has made repeated attempts to castrate herself—most recently, in mid-2021. ECF 81 at 1.[2]

The Department did not move to dismiss Levy's claims, but Dr. Kraft has. The question here is whether Levy has alleged facts sufficient to state a section 1983 claim as to Dr. Kraft based on his role as the Department's Gender Dysphoria Consultant and his direct involvement with her case. Under binding Fourth Circuit law, she has. In *De'lonta v. Johnson*, the Fourth Circuit reversed dismissal of a case with almost identical facts, holding that the plaintiff had adequately pleaded a section 1983 claim. 708 F.3d 520 (4th Cir. 2013). There, the Fourth Circuit concluded that a transgender inmate stated a cognizable claim when she had received hormones but the facility has "refus[ed] to evaluate her for surgery" in a manner that is "consistent with the Standards of Care" published by the World Professional Association for Transgender Health. *Id.* at 526.

The Fourth Circuit, and several courts since *De'lonta*, have recognized that that the Standards of Care are the "generally accepted protocols" for the treatment of gender dysphoria.[3] The Standards of Care establish a "triadic treatment of sequence" that includes (1) hormone therapy, (2) social feminization, and (3) sex reassignment surgery. *De'lonta*, 708 F.3d at 523. The Standards of Care provide that after "one year of hormone therapy and living in the patient's

---

[2] Kraft's motion to dismiss cites certain materials on the docket other than those incorporated by reference into the Amended Complaint. *See, e.g.*, MTD 3, 4, 6 (citing Declaration of Randall S. Nero, Ph.D., ECF 26-1). In resolving the motion to dismiss, the Court should consider only materials incorporated into the complaint, and should not prejudice Levy's opportunity for further discovery by prematurely resolving issues of disputed fact. Subject to this objection, Levy follows Kraft's lead by including additional citations to the record where they can provide context for her allegations, which must be taken as true.

[3] *De'lonta*, 708 F.3d at 522-23; *see also Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) (quoting *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1111 (D. Idaho 2018)) (The Standards of Care are "the internationally recognized guidelines for the treatment of individuals with gender dysphoria"); *Soneeya v. Spencer*, 851 F. Supp. 2d. 228, 231 (D. Mass 2012) (The course of treatment for gender dysphoria is "governed by the 'Standards of Care' promulgated by the World Professional Association for Transgender Health").

identified gender role, sex reassignment surgery may be necessary for some individuals for whom serious symptoms persist." *De'lonta*, 708 F.3d at 522-23. In these cases, sex reassignment surgery is "not considered experimental or cosmetic; it is an accepted, effective medically indicated treatment" for those suffering with gender dysphoria. *Id.* Denial of adequate assessment and treatment—including sex reassignment surgery, where appropriate—is sufficient to state a section 1983 claim for a violation of the Eighth Amendment. *Id.* at 526.

The Fourth Circuit's decision in *De'lonta* compels the conclusion that Levy's claim may proceed. Indeed, Levy's claim that Defendants have violated her right to adequate treatment is even stronger than De'lonta's, because the Amended Complaint reflects that several doctors have recognized that hormones and social feminization alone are insufficient treatments for Levy's severe gender dysphoria. Rather, Levy's continued suffering after more than "one year of hormone therapy and dressing as a woman," calls for what both *De'lonta* and the Standards of Care recognize as the "necessary" third phase of treatment: "sex reassignment surgery." *Id.* at 525.

Kraft's motion to dismiss entirely neglects to mention *De'lonta*, which controls the outcome here. And most of his arguments are factual, centered on whether Levy's doctors truly meant to recommend sex reassignment surgery and whether Levy's circumstances necessitate surgical intervention. These factual disputes are inappropriate for resolution on a motion to dismiss, where the Court must "assume the veracity" of well-plead facts and construe all "reasonable inferences" in favor of the complainant. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Levy has adequately alleged each of her claims, and Kraft's motion to dismiss should be denied.

## FACTUAL BACKROUND

Shawnte Anne Levy is currently in the Department's custody at the North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. Although Levy was designated male

at birth, she "has had interest in [male-to-female] transition since childhood and was diagnosed with gender dysphoria in 1984." ECF 72-6 at 1; Am. Compl. at ¶¶ 1, 2, 27.

As an initial step to treat her gender dysphoria, Levy began hormone replacement therapy in January 2016. *Wexford Med. Sources, Inc.*, 2017 WL 3431951 at *10. However, her dysphoria did not improve following hormone treatment, and she continued to suffer mental anguish and suicidal ideation in connection with her physical characteristics. Am. Compl. at ¶ 2. At all relevant times throughout litigation, Levy has suffered an uncontrollable urge to self-mutilate and castrate herself. Am Compl. at ¶ 2; ECF 81 at 1 (2021 attempted self-castration resulting in hospitalization).

Since 2016, several independent physicians have recognized that hormones and social feminization alone are insufficient to treat Levy's severe dysphoria and desire to self-mutilate. Am. Compl. at ¶¶ 13, 15, 20. On November 11, 2016, Lauren Brooks, M.D., an endocrinology fellow at the University of Maryland Medical Center, wrote to Defendant Dr. Randall S. Nero of the Department's Gender Dysphoria Committee. Am Compl. at ¶ 13. Dr. Brooks asked that Nero refer Levy to urology to be evaluated for an inguinal hernia and an orchiectomy—the removal of the testicles, a frequent first step in sex reassignment surgery.[4] Instead, after Dr. David Levitt confirmed that "there was no medical contraindication to orchiectomy" on April 27, 2017, Levy was sent to meet with Kraft. Am. Compl. at ¶¶ 15, 16; ECF 72-3 at 3.

Defendant Christopher Kraft is a Maryland resident and a psychologist in the Department of Psychiatry at the Johns Hopkins School of Medicine. Am. Compl. at ¶¶ 3, 7; MTD 3. Kraft

---

[4] Am Compl. at ¶ 13; *see also Gender Affirmation Surgeries*, JOHN HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/wellness-and-prevention/gender-affirmation-surgeries (last visited Jun. 6, 2022) (describing orchiectomy as one part of vaginoplasty, a form of male-to-female sex reassignment surgery).

holds the official title of "Gender Dysphoria Consultant," as described in OPS 131.0001 ("the Executive Directive"), the Department's policy for treating and managing transgender inmates. *See* MTD 3; ECF 43-2 at §.01. The Executive Directive defines the "Gender Dysphoria Consultant" as "a licensed health care professional who has credentials, training, and documented experience with the Gender Dysphoria population, as well as board certified psychiatrists, licensed psychologists, and licensed social workers who treat individuals with Gender Dysphoria." ECF 43-2 at §.04B(6).

Under the Executive Directive, the Gender Dysphoria Consultant plays a significant role in determining which inmates receive treatment for gender dysphoria. For example, when the Regional Treatment Team cannot agree on whether to accept a Gender Dysphoric Diagnosis, the Consultant serves as the tie-breaker. ECF 43-2 at §.05C(4)(b). If the Consultant accepts the diagnosis, the "Regional Treatment Team shall notify the respective Mental Health Clinician to initiate treatment planning." ECF 43-2 at §.05C(5)(a). But if the Consultant rejects the diagnosis, the "Regional Treatment Team shall refer the case to the Regional Director of Mental Health to arrange for appropriate medical and mental health treatment options." ECF 43-2 at §.05C(5)(b). The Consultant's recommendations also invoke examination requirements. "If the Gender Dysphoria Consultant recommends hormone therapy as a component of the individualized treatment plan, the inmate *shall* be referred to and evaluated by the contracted medical services provider." ECF 43-2 at §.05E(3) (emphasis added).

The importance of the Gender Dysphoria Consultant's, and Kraft's, role in the treatment of dysphoric Department inmates is well-documented. In *Canter v. Mamboob*, a Maryland inmate alleged that prison officials prevented her from receiving medical treatment by refusing to allow her to be assessed for gender dysphoria. 2020 WL 1331894, at *1-2 (D. Md. Mar. 23, 2020). In

response, the officials alleged that the plaintiff had been assessed by Kraft during the pendency of litigation. *Id.* However, the plaintiff stated "she had not been seen by Kraft" and the court concluded that the officials' declaration, which provided no evidence of Kraft's examination or its conclusions, "at best" suggested that "Kraft had not completed whatever evaluation he may have initiated." *Id.* at *3. The Court also referenced potential unreliability in Kraft's purported 2017 meeting notes, referencing "attached emails between counsel that indicate[d] . . . that Dr. Kraft had prepared the Note in 2019 and backdated it to July 18, 2017." *Id.* at *5.

Moreover, in her declaration to this Court, the Department's Director of Clinical Services, Sharon Baucom, stated that the Department's "Gender dysphoria Committee membership does include a John Hopkins Specialist in dysphoria . . . who [is] directly involved in providing care and treatment to inmate Levy." ECF 16-5 at ¶ 5. Thus, regardless of what the Executive Directive may describe about the Consultant's role, Kraft was a full member of the Regional Treatment Team—often referred to as the Gender Dysphoria Committee—when decisions were being made about Levy's treatment. *Id.* He was "directly involved" in Levy's treatment and care. *Id.* Kraft allegedly even represented himself as "the new chair of the 'Gender Disorder Committee'" on July 18, 2017, only five days before he met with Levy. *See Canter*, 2020 WL 1331894, at *6; *see also* Am. Compl. at ¶ 7 (Levy's "information and belief" that Kraft "is a member of [the Department's] Gender Dysphoria Committee").

Levy met with Kraft on July 23, 2017 at NBCI. Am. Compl. at ¶¶ 16-17. Kraft was accompanied by Defendant Nero and NBCI counselor Bruce Liller. Am Compl. at ¶¶ 16-17. Despite Levy's ongoing urge to self-castrate, Kraft "would not talk to Levy about sex reassignment surgery" and wanted her to "wear a male compression undergarment, to change her mind about (SRS)." Am. Compl. at ¶ 16. After the meeting, Levy alleges that Kraft put a "freeze frame" on

her gender dysphoria treatment, preventing her from moving from hormone treatment and social feminization to the third step in the triadic treatment sequence: sex reassignment surgery. *See* Am. Compl. at ¶ 16.

Following the meeting, on January 11, 2018, Levy met with Dr. Brooks and endocrinologist Rana Malek, M.D. Am. Compl. at ¶ 20; Ex. 3 to Pl's Compl., ECF No. 1-3 (cited at MTD 4). Levy asked the doctors if they supported her desire to undergo sex reassignment surgery, and Dr. Malek memorialized in his notes that he and Brooks, "support her decision to undergo gender affirming surgery." Ex. 3 to Pl's Compl., ECF No. 1-3 at 1.

Almost a year later, on November 9, 2018, the Gender Dysphoria Committee met to discuss Levy's continuing desire for sex reassignment surgery. *See* Declaration of Randall S. Nero, Ph.D., ECF 26-1 at 1. The Committee concluded that her current treatment of hormones, therapy, and social feminization was sufficient and did not recommend her for the surgery. *Id.* Kraft was a part of this decision. He and Nero reviewed Dr. Brooks' and Dr. Malek's clinical notes from their January 11 meeting with Levy and concluded that the doctors merely meant to support Levy in "her process," not "the actual surgery." *Id.* at 2. This narrow interpretation of Levy's doctors robbed her of her clinical support.

Levy continued to suffer with severe dysphoria following the Committee's decision. In mid-2021, Levy was hospitalized after attempting to castrate herself with a razor. ECF 81 at 1. She continues to suffer extreme genital pain and urinary incontinence in connection with this incident. *Id.* Despite this serious event, the medical providers around her allegedly continue to invoke Kraft's name in denying her adequate gender dysphoria treatment, stating "Dr. Christopher Kraft is not going to allow you to receive sex reassignment surgery or any transsexual transition surgery." *Id.* at 2.

**STANDARD OF REVIEW**

Levy was *pro se* when she filed her complaint, which therefore must be "liberally construed," and, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). A *pro se* litigant's complaint should not be dismissed "unless it appears beyond doubt" the litigant can prove "no set of facts in support of his claim that would entitle him to relief." *Harris v. Publish Am.*, *LLP*, 2015 WL 4429510, at *1 (D. Md. July 17, 2015) (quoting *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978)).

To survive a motion to dismiss, Levy's complaint need only contain "a short and plain statement of the claim showing that [she] is entitled to relief." Fed. R. Civ. P. 8(a)(2). Her allegations need merely state a "plausible" claim for relief that "permit[s] the court to infer more than the mere possibility of misconduct" based upon "its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A court must "assume the[] veracity" of factual allegations contained in a complaint and draw all "reasonable inferences" in favor of the complainant. *Id.* at 678. The court may not resolve any factual disputes at the motion-to-dismiss stage.

**ARGUMENT**

**I.      Levy Has Alleged a Claim Against Kraft for Deliberate Indifference to her Medical Needs.**

Levy has alleged that Kraft deprived her of her Eighth Amendment rights by failing to provide her with adequate gender dysphoria care, including sex reassignment surgery. Am. Compl. at ¶¶ 26-30. Under the Eighth Amendment and Section 1983, a prisoner can sue individuals vested with state authority, like Kraft, for being deliberately indifferent to the

prisoner's serious medical needs.[5]  Levy has thoroughly stated a deliberate indifference claim against Kraft, who she alleges "removed sex reassignment surgery" as an "adequate treat[ment]" for her "gender dysphoria."  Am. Compl. at ¶ 16.  Allegedly, Kraft withheld surgery even though he "knew of" Levy's "serious medical need" for "sex reassignment surgery."  Am. Compl. at ¶ 28.  Kraft's alleged "disregard[]" for Levy's serious medical need and his failure to "take any reasonable measures to address [the] continued pain and suffering resulting from her gender dysphoria" is sufficient to support Levy's deliberate indifference claim.  Am. Compl. at ¶ 28.

### A. *De'lonta v. Johnson* **established the two factors prisoners must satisfy in order to state a claim of deliberate indifference concerning gender dysphoria.**

*De'lonta v. Johnson* sets out the governing standard in this Circuit for deliberate indifference claims concerning the medical treatment of inmates with gender dysphoria or gender identity disorder.[6]  In *De'lonta*, an inmate with gender dysphoria, suffered many of the same injustices as Levy.  708 F.3d 520, 523 (4th Cir. 2013).  De'lonta's dysphoria caused her "constant mental anguish" and, like Levy, De'lonta attempted to castrate herself and perform "makeshift sex reassignment surgery" while incarcerated.  *Id.*  In 2011, De'lonta brought an Eighth Amendment claim under Section 1983, alleging that prison officials had been deliberately indifferent to her

---

[5] Kraft does not dispute that, although he is a consultant for the Department, he can be sued under Section 1983.  Nor could he:  private physicians who contract with the state to provide care to incarcerated individuals act "under color of state law" within the meaning of Section 1983.  *West v. Atkins*, 487 U.S. 42, 54 (1988); *see also Conner v. Donnelly*, 42 F.3d 220, 222-23 (4th Cir. 1994) (allowing claim with contracting physician treating Maryland inmate).

[6] "The term 'gender identity disorder' was replaced by the term 'gender dysphoria' in the Diagnostic and Statistical Manual of Mental Disorders ("DSM") [i]n 2013, with the publication of the fifth edition ('DSM-5')."  *Iglesias v. True*, 403 F. Supp. 3d 680, 687 (S.D. Ill. 2019); *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 768 (9th Cir. 2019) ("Until recently, the medical community commonly referred to gender dysphoria as 'gender identity disorder.'").  This motion replaces historical usage of "gender identity disorder" with the modern term, "gender dysphoria."

medical rights by failing to adequately assess her for sex reassignment surgery. *Id.* The district court dismissed the case, but the Fourth Circuit reversed.

The Fourth Circuit laid out the two elements a plaintiff must plead to establish her doctors and caretakers violated her Eighth Amendment right to medical care. *Id.* at 525. First, a plaintiff must allege "that the deprivation of [a] basic human need was objectively serious." *Id.* Second, a plaintiff must allege that the defendants "subjectively" acted "with a sufficiently culpable state of mind," including "deliberate indifference" to the plaintiff's medical need. *Id.*

Applying those elements, the Fourth Circuit in *De'lonta* had little trouble concluding that De'lonta had alleged an adequate section 1983 claim. First, the Fourth Circuit held that De'lonta "alleged an objectively serious medical need for protection against continued self-mutilation" caused by her gender dysphoria. *Id.* at 525. The court stated that prison officials "have a duty to protect prisoners from self-destruction or self-injury." *Id.* (quoting *Lee v. Downs*, 641 F.2d 1117, 1121 (4th Cir. 1981)). It referred to its prior decision in *De'lonta v. Angelone*, where De'lonta sued prison officials for withholding hormone treatment. *Id.* (citing 330 F.3d 630, 634 (4th Cir. 2003) [hereinafter *De'lonta I*]). There, the Fourth Circuit recognized that De'lonta's dysphoria-driven self-mutilation invoked officials' duty to protect her. *De'lonta I*, 330 F.3d at 634. The court was clear in *both* De'lonta cases that officials that could not be "deliberately indifferent" to De'lonta's dysphoria by withholding "hormone treatment" or "other treatment to prevent her from continuing self-inflicted injuries." *Id.*

Second, the Fourth Circuit held that De'lonta's complaint sufficiently alleged the defendants acted with deliberate indifference toward her serious medical need. Deliberate indifference requires that the defendants "know of and disregard an objectively serious condition, medical need, or risk of harm." *Id.* (citing *De'lonta I*, 330 F.3d 630 at 634). The court explained

that, at all relevant times, the defendants were "aware of De'lonta's [gender dysphoria] and its debilitating effects on her." *Id.* Even though the officials had provided her with hormone treatments, mental health consultations, and had "allowed her to live and dress as a woman," the court concluded that De'lonta adequately stated a section 1983 claim based on the prison's failure to provide an adequate assessment for surgery. *Id.* While these treatment options accorded "the first two stages of triadic protocol established by the Standard of Care," the defendants ignored that "the Standards of Care also indicate that sex reassignment surgery may be necessary for individuals who continue to present with severe [gender dysphoria] after one year of hormone therapy and dressing as a woman." *Id.* The Fourth Circuit likened the defendants' failure to assess De'lonta for sex reassignment surgery and decision to continue with only the first two stages of care to "prescrib[ing] a painkiller to an inmate who has suffered a serious injury from a fall": although it may constitute *some* treatment, it is not necessarily *adequate* treatment. *Id.* at 526.

Several other courts have recognized that an inmate pleads an Eighth Amendment violation under Section 1983 on these or similar facts. *See Rosati v. Igbinoso*, 791 F.3d 1037, 1039-40 (9th Cir. 2015) (inmate stated a claim that officials were deliberately indifferent to her dysphoria and self-castration attempts by withholding sex reassignment surgery); *Iglesias v. Fed. Bureau of Prisons*, No. 19-cv-415-njr, 2021 WL 4943739, at *7-8 (S.D. Ill. Oct. 22, 2021) (same); *Campbell v. Kallas*, No. 16-cv-261-jdp, 2018 WL 2089351, at *8-9 (W.D. Wis. May 4, 2018) (same), *rev'd on other grounds*, 936 F.3d 536, 549 (2019) (reversing summary judgement based on qualified immunity). This very district has recognized that a gender dysphoric NBCI inmate "adequately allege[s] that Defendants were deliberately indifferent to her medical needs" when the officials are aware of ongoing dysphoria and nevertheless withhold dysphoria treatment. *Canter v. Mover*, 2018 WL 1513012, at *5 (D. Md. Mar. 26, 2018).

**B.  Levy's complaint satisfies both factors established in *De'lonta*, so Kraft's motion must be denied.**

Levy adequately alleges both elements established in *De'lonta* as to Kraft.  First, the deprivation of a "basic human need was objectively serious."  Kraft concedes that Levy has "a long-standing diagnosis of gender dysphoria."  MTD 13.  *De'lonta* already held that, in cases like Levy's where gender dysphoria causes self-mutilation, the plaintiff has plead an "objectively serious medical need."  708 F.3d at 525.  Kraft, as Gender Dysphoria Consultant, has "a duty to protect prisoners from self-destruction or self-injury."  *Lee v. Downs*, 641 F.2d 1117, 1121 (4th Cir. 1981).  In that respect, Kraft is no different from the several doctors De'lonta named in her complaint.  Levy not only alleges that she has not been appropriately considered for sex reassignment surgery, but also that Kraft has personally "frozen" Levy's care and removed sex reassignment surgery as a treatment option for her.  *See* Am. Compl. at ¶ 16.

Second, Levy has adequately alleged that Kraft personally acted "with a sufficiently culpable state of mind," *i.e.* "a showing of deliberate indifference" by "know[ing] of and disregard[ing] an objectively serious condition, medical need, or risk of harm."  *De'lonta*, 708 F.3d at 525.  Levy has alleged that Kraft was brought in by NBCI to treat her in July 2017, a year and a half after NBCI started her hormone therapy and long after she had received a diagnosis of gender dysphoria.  Am. Compl. at ¶ 16; MTD 13.  Despite the fact that sex reassignment surgery is the recognized next step in treatment for many people who continue to suffer with dysphoria after only *one year* of hormone treatment, Kraft allegedly refused "to talk about sex reassignment surgery" with Levy despite her continued suffering after *a year and a half* on hormones.  Am. Compl. at ¶ 16.  In fact, Levy alleges that Kraft tried to "change her mind about [sex reassignment surgery]" by proposing she wear a "male compression undergarment" instead.  Am. Compl. at ¶

16. She also states that each Defendant, including Kraft, both "knew of" and was "deliberately indifferent to [her] medical need for [sex reassignment surgery]." Am. Compl. at ¶ 28.

Under *De'lonta*, these allegations are sufficient to state a claim for deliberate indifference, as Kraft was fully appraised of Levy's circumstances and nevertheless proposed an inadequate form of treatment and withheld sex reassignment surgery, the necessary measure of care for someone in Levy's situation. Moreover, the record—and Kraft's motion to dismiss—are silent on developments in the last two years. In that time, it is undisputed that Levy has not received surgery, and has continued to suffer with dysphoria and the desire to self-castrate. *See* ECF 81 at 1 (describing mental anguish and castration attempts into mid-2021). Despite this, there is no evidence that the Gender Dysphoria Committee has reconsidered her case for surgery or that Levy has received ongoing sex reassignment consultations. Under *De'lonta*, that lack of reconsideration alone could constitute deliberate indifference. 703 F.3d at 536. Kraft remains the Gender Dysphoria Consultant and tied to Levy's care, and other employees have allegedly invoked his name in denying Levy care as recently as October 2021. ECF 81 at 1. Dismissal before discovery would prematurely cut off Levy's potential right to relief for ongoing violations that occurred after she filed the Amended Complaint.

C. **Kraft's responses to Levy's deliberate indifference claim ignore *De'lonta* and inappropriately rely on factual disputes that must be resolved through discovery.**

Kraft has two responses to Levy's claims, but neither warrants dismissal. Kraft first argues that Levy cannot state a claim for medical indifference because she "has received and continues to receive extensive treatment for gender dysphoria." MTD 14. He contends that Levy has not alleged facts sufficient to demonstrate that her current treatment "consisting of a combination of hormone therapy, social feminization, psychiatric care, and supportive therapy" is medically inappropriate or that her treatment is inadequate without sex reassignment surgery. MTD 14-15.

*De'lonta* squarely forecloses Kraft's argument. There, as here, De'lonta settled an earlier lawsuit against the government, and the government provided her with hormone treatment and mental health consultations and permitted her to dress as a woman consistent with the first two phases of the triadic protocol established by the Standards of Care. *De'lonta*, 708 F.3d at 525. Nevertheless, the Fourth Circuit recognized that she stated a claim for medical indifference because "sex reassignment surgery may be necessary for individuals who continue to present with severe [gender dysphoria] after one year of hormone therapy and dressing as a woman." *Id.* Moreover, the mere fact that the government "previously acknowledged De'lonta's condition and agreed to provide treatment in no way forecloses the possibility that its performance under that agreement later became constitutionally deficient." *Id.* at 526.

The same is true here. While it may be the case that Kraft and other prison officials have provided Levy with some measure of treatment to alleviate her symptoms, "it does not follow that they have necessarily provided her with constitutionally adequate treatment." *Id.* Levy continues to suffer serious dysphoria and the desire to self-mutilate despite the treatments that Kraft describes. Sex reassignment surgery is the next step prescribed by the Standards of Care, and Kraft and the Department's failure to adequately assess or reassess Levy for surgical intervention states a cognizable claim that they have been indifferent to Levy's serious medical need.

Second, Kraft's motion seeks inappropriately to resolve disputes of fact. MTD 15. But when a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). At this stage, the court cannot resolve disputes of fact and should only determine whether the plaintiff has pleaded *any facts* that, when read in the plaintiff's favor, could plausibly support her claims. *See, e.g.*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56

(2007).  Indeed, a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely."  *Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  Levy's complaint passes this low bar.

Much of Kraft's motion seeks to prematurely litigate the facts of Levy's case.  For example, Kraft argues that he did not have a duty to recommend Levy for sex reassignment surgery because Levy's other doctors did not "record[] a medical recommendation" for sex reassignment surgery or indicate that Levy's "existing treatment regimen was improper or inadequate."  MTD 5.  Kraft's reading of the doctors' reports is dubious—even implausible.  Dr. Brooks wrote that she "support[s] [Levy's] decision [to] pursue gender affirming surgery," while Dr. Malek was clear that both he and Brooks "support [Levy's] decision to undergo gender affirming surgery."  Ex. 3 to Pl's Comp., ECF No. 1-3 at 1-2.  Moreover, Kraft does not address Dr. Levitt's report on Levy, which concluded that "there was no medical contraindication to orchiectomy."  ECF 72-3 at 3.  Levitt's report undermines Kraft's other factual argument that Levy's other diagnoses made it appropriate for Kraft to withhold sex reassignment surgery.  MTD 5-6.  In any event, Kraft's repeated turn to the facts admits, at best, a dispute of fact as to whether he was deliberately indifferent to Levy's needs.  This dispute cannot be resolved on a motion to dismiss.

Kraft also recharacterizes his meeting with Levy and attempts to pre-litigate the factual issue of whether he provided adequate care.  He states that he "recommended genital comfort interventions" but "did not recommend that Plaintiff undergo [sex reassignment surgery]."  MTD 14.  Whether these so-called "comfort interventions"—male compression shorts—were an appropriate substitute or constituted adequate medical care is a question of fact.  Similarly, whether Kraft subjectively believed the male garment was an adequate treatment cannot be resolved on a motion to dismiss.

Finally, discovery is necessary because the current record is unclear about what actions, if any, Kraft and the other Defendants have taken to address Levy's dysphoria in the last two years. Levy has still not received sex reassignment surgery, and the record does not state whether Defendants have reconsidered her case for surgery since the Gender Dysphoria Committee met in 2018. If the Defendants have failed to reconsider Levy's case despite ongoing dysphoria and castration attempts, their inaction alone would be sufficient to sustain Levy's deliberate indifference claim under *De'lonta*. 708 F.3d at 536.

## II.   Levy Has Alleged a Claim Against Kraft for Failure to Transfer.

As this Court has acknowledged, Levy's Amended Complaint makes three primary allegations: that Defendants failed to "provide her with medically necessary gender affirming surgery, access to women's products through the commissary or otherwise, and to *designate her to a women's prison*." ECF 47 at 2 (emphasis added). Kraft's motion does not address Levy's claim that the defendants violated her Fourteenth Amendment rights by failing to transfer her to a female correctional facility.[7]

---

[7] Although not listed in the Amended Complaint's specific counts, Levy's claim based on failure to transfer her to a female facility is clear from her filings, and *pro se* complaints must be "liberally construed," and held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 552 U.S. 89, 94 (2007). Thus, the Court was correct to recognize that Levy was bringing a claim based on Defendants' failure to transfer her. The first paragraph of the Amended Complaint explains that Levy is bringing this action under Section 1983 because Defendants have denied to place her in a "female correctional inst[it]ution in violation of . . . [the] United States Constitution Fourteenth Amendment." Am. Compl. at ¶ 1. Levy referenced the Defendants' failure to transfer her to an appropriate facility throughout the Complaint. Am. Compl. at ¶ 17 ("[Defendant] informed Plaintiff Ms. Levy that she is not being transfer to women prison (MCI-W) . . . , That is discriminatory of the basis sex"), ¶ 25 (No plan was made to "transfer plaintiff to female DPSCS facility" which deprived plaintiff of "equal protection of the laws of the Fourteenth Amendment"). Levy has also made her housing claim apparent in filings since amending. *See* ECF 59 at 1 ("Defendants are in violation of Ms. Levy Eighth Amendment rights and Equal Protection Clause of the Fourteenth Amendment for not providing women's designation housing"); ECF 90 at 2 ("[Levy] also further asserted an equal protection claim based on refusal of prison officials to designate her to correctional institution for women").

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." To allege an equal protection claim, a plaintiff must demonstrate "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *King v. Rubenstein*, 825 F.3d 206, 220 (4th Cir. 2016) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). The court then considers whether the disparity in treatment can be justified under the requisite level of scrutiny. *Id.* Levy has satisfied both the pleading and scrutiny requirements here.

### A. Levy has sufficiently alleged that Kraft intentionally treated her differently from other, similarly situated inmates.

With respect to the pleading requirements, Levy has alleged that the Defendants will not transfer her to the Maryland Correctional Institution for Women despite her female legal status. Am Compl. at ¶ 17; *see also id.* at ¶¶ 1, 25 (alleging that Defendants will not house her in a female correctional institute despite her legal status as a female). She has alleged that she is "treated differently th[a]n other female[s] serving a sentence" and from other "female citizen[s] of Maryland." Am. Compl. at ¶ 3. She describes how, because she is not housed in a female facility, she is not allowed access to the "v[a]riety of female dress clothing" that other legal women receive in "female assigned institution[s]." Am. Compl. at ¶ 21. Thus, Levy has adequately pleaded that she is being treated differently than other Maryland inmates with legal female status, who are housed in female facilities. *See King*, 825 F.3d at 221 (Fourth Circuit accepts equal protection claim in which inmate alleges he was "single[d]" out from similar inmates). Whether the discrimination is based on her status as female or her status as transgender (or both), Levy alleges a cognizable Section 1983 claim under the Fourteenth Amendment. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608-13 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*,

141 S. Ct. 2878, 210 L. Ed. 2d 977 (2021) (Transgender student alleged equal protection claim either because discrimination against transgender individuals is sex-based discrimination or because transgender people are a quasi-suspect class).

Kraft contends that Levy cannot raise an equal protection claim based on her treatment relative to cisgender women because Levy, as a transwoman, is "dissimilar" from "cisgender biological females." MTD 18. This argument betrays Kraft's "stereotypic notions" of sex. *Grimm*, 972 F.3d at 610. The complaint, and the state of Maryland, is clear that Levy is a woman. Am. Compl. at ¶¶ 1-2; Ex. 6 (Levy's Maryland birth certificate reflecting her female status). She is similarly situated to other women, including cisgender women, and treating her differently from them is to discriminate "based on [Levy's] sex-assigned-at-birth." *Grimm*, 972 F.3d at 610. Accordingly, Kraft's argument fails.

Levy has also plead that the Defendants intentionally discriminated against her. She alleges that during a conversation in which officials told her they would not transfer her, the officials exhibited obvious bias towards her, stating "No one likes you," "They hate you," and that "[NBCI] is not for you." Am. Compl. at ¶ 17. The officials stated that unspecified others— including, possibly, Kraft—were "fearful of taking a chance" on transferring Levy to another facility where women were housed. These allegations are sufficient to state an intentional disparity in treatment from other similarly situated inmates. *See Krell v. Braightmeyer*, 828 F.App'x 155, 159 (4th Cir. 2020) (state trooper's alleged use of insulting language during an arrest was sufficient to demonstrate an intentional disparity in treatment).

Moreover, as Gender Dysphoria Consultant and one Levy's doctors, Kraft exercised authority over Levy's housing placement, and so is an appropriate defendant on this claim. The Executive Directive provides that mental health staff, like Kraft, can "provide input as to clinical

recommendations related to housing of a Gender Dysphoric inmate." ECF 43-2 at §.05J(3). Kraft's personal authority over Levy's housing is sufficient at this stage to state a claim and proceed to discovery regarding whether Kraft ever exercised that authority in a discriminatory manner.

**B.      Kraft's refusal to transfer Levy is not reasonably related to a legitimate penological interest.**

Kraft contends that, in order to "state an equal protection claim," a prisoner "must allege facts to overcome the presumption of reasonableness applied to prison policies." MTD 17. He argues that, even if his behavior would "otherwise warrant higher scrutiny" and "be unconstitutional," the lesser scrutiny in the prison context warrants dismissal in this case. *Id*. Not so. Kraft's overbroad reading of Fourteenth Amendment precedent conceals the reality of equal protection claims for prisoners. While it is true that prison policy receives lesser scrutiny than it might in other contexts, prisoners state an equal protection claim against prison officials when the officials' acts or policies are not "reasonably related to legitimate penological interests." *King*, 825 F.3d at 221 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see also Morrison v. Garraghty*, 239 F.3d 648, 655 (4th Cir. 2004).

To evaluate whether a challenged action is reasonably related to legitimate penological interests, courts apply a four factor test: (1) whether there is a "valid, rational connection between the policy and the penological interest"; (2) whether there is an "alternative means of exercising the right" available to inmates; (3) what "impact accommodation of the asserted right will have on" the prison, including guards, other inmates, and prison resources; and (4) "the absence of ready alternatives that fully accommodate the prisoner's rights at de minimis cost to valid penological interests." *Morrison*, 239 F.3d at 655. None of these four factors weigh in favor of denying Levy her rights.

As to the first factor, there is no "valid, rational connection" between housing Levy in a men's facility and the "penological interest." *Id.* at 655. Levy is legally female, and can presumably be safely housed in a woman's facility while maintaining any appropriate level of security. As to the second factor, Levy cannot exercise her right to be housed in the same fashion as other female inmates on her own. As an incarcerated person, Levy's housing is in the hands of the Department and Kraft. *See* ECF 43-2 at §.05J(3). For factor three, if Levy's right to be housed with other legal females was enforced, it would have little to no effect on NBCI overall. In terms of resources, Levy would be an unremarkable older inmate at a female facility. Many women Levy's age require hormone replacement therapy as part of menopause treatment.[8] And NBCI struggles to provide Levy with feminine products and female hormones, which would be more efficiently delivered at a female facility. *See, e.g.*, ECF 98 at 1 (NBCI "abruptly stop[ped] access to female hygiene female pee pads (panty liners), I am unable to keep my self dry of pee . . . because of injury to my genitals"). And as to the fourth factor, there are no "ready alternatives" that can accommodate Levy. *Morrison*, 239 F.3d at 655. The Department can either house Levy like other legal women—in a women's facility—or unlike other legal women, in a men's facility. The divided nature of the Department's housing leaves little room for compromise.

Finally, the Fourth Circuit has held that "[p]romoting the inmates' safety and health is a legitimate concern" when considering whether a prison's actions are rationally related to a legitimate interest. *Jehovah v. Clarke*, 798 F.3d 169, 178 (4th Cir. 2015). Even if the prison's penological interests are important, they cannot supersede Levy's health. Continuing to house

---

[8]     *Introduction      to      Menopause*, JOHN HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/introduction-to-menopause (last visited Jun. 7, 2022) (Describing "taking a combination of the female hormones estrogen and progesterone during perimenopause and menopause" as a therapy to "help manage menopause symptoms").

Levy in a male facility poses an outsized risk to her physical and mental health, and it cannot withstand constitutional muster.

The precise weighing of these factors, in any event, is better suited to resolution after an appropriate opportunity for discovery. At this stage, Levy has adequately alleged her claim for transfer to a female facility under the Fourteenth Amendment.

## CONCLUSION

Shawnte Anne Levy has adequately alleged her Section 1983 claim under the Eighth Amendment that Kraft failed to provide her with adequate gender dysphoria care, including sex reassignment surgery, and her Section 1983 claim under the Fourteenth Amendment that Kraft failed to provide her with appropriate housing in a women's correctional facility. Kraft's motion to dismiss should accordingly be denied.

Dated: June 27, 2022

Respectfully submitted,

/s/ *Edward J. Bennett* _____
Edward J. Bennett
Michael J. Mestitz (pro hac vice pending)
Madison A. Needham (pro hac vice pending)
WILLIAMS & CONNOLLY LLP
680 Main Ave SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
ebennett@wc.com
mmestitz@wc.com
mneedham@wc.com

*Attorneys for Plaintiff*