# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (SOUTHERN DIVISION)

| | | |
|---|---|---|
| SHAWNTÉ ANNE LEVY | * | |
| Plaintiff | * | |
| v. | * | Civil Case No. 8:18-cv-01291-TDC |
| ROBERT L. GREEN, et al. | * | |
| Defendants | * | |

## MEMORANDUM OPINION AND ORDER

This is a case arising out of the refusal of Defendants, various officials and employees of the Maryland Department of Public Safety and Correctional Services, to provide gender confirmation surgery, housing in a women's facility, and women's commissary items to Plaintiff Shawnté Anne Levy, a transgender woman in their custody.  On March 29 and April 1, 2024, Dr. Joseph Penn, an expert Defendants retained, conducted an independent medical examination of Ms. Levy without the knowledge or consent of Ms. Levy's counsel.  Pending before the Court are Ms. Levy's request for initiation of the Court's discovery dispute resolution procedure, ECF Nos. 162, 165, and Defendants' Motion for an Independent Medical Examination *Nunc Pro Tunc*, ECF No. 168.  The parties have thoroughly briefed the issues; accordingly, no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2023).  Had this been Defendants' first violation of the Court's Orders, the Court could have excused their error.  However, remedial action is necessary given Defendants' previous failures to comply with the Court's Scheduling Orders and the impact on the opposing party in this case.  For this reason and the reasons discussed below, the Court will deny Defendants'

1

Motion, strike Dr. Penn's report and testimony, and preclude Dr. Penn from further participation in this case.

## BACKGROUND

The facts of this case, as relevant to the current dispute, are as follows.  On May 2, 2018, Plaintiff Shawnté Anne Levy filed a pro se Complaint with this Court against various officials and employees of the Maryland Department of Public Safety and Correctional Services ("Defendants" or "the Department").  ECF No. 1.  Ms. Levy, a transgender woman who is incarcerated at North Branch Correctional Institution in Cumberland, Maryland, alleges that the Department has violated her rights under the Eighth and Fourteenth Amendments to the U.S. Constitution by refusing to provide her with medically necessary gender confirmation surgery to treat her gender dysphoria, house her in a women's facility, and provide her with commissary items that are available to other women in the Department's custody.  *See id.* at 1–2; ECF No. 179, at 4.  On April 8, 2022, the Court appointed pro bono counsel to represent Ms. Levy.  *See* ECF No. 103; ECF No. 179, at 4. On November 9, 2022, the Court denied Defendants' Motion to Dismiss for Failure to State a Claim.  ECF No. 125.  On the Court's instruction, *id.*, the parties filed a Joint Motion to Modify the Scheduling Order on November 23, 2022, which proposed May 1, 2023, as the deadline for Defendants' expert disclosures, ECF No. 126, at 2, and which the Court granted on November 28, 2022, ECF No. 128.  On August 9, 2023, the Court granted the parties' joint request to again modify the scheduling order and extended the deadline for Defendants' expert disclosures to October 20, 2023.  ECF No. 141.  The Court granted another joint motion to modify the scheduling order on November 8, 2023, extending the deadline for Defendants' expert disclosures to November 20, 2023.  ECF No. 147, at 2.

On February 16, 2024, Ms. Levy notified the Court of a dispute between the parties regarding the discovery schedule in the case.  ECF No. 152.  Specifically, although Ms. Levy timely served two expert reports on Defendants on October 1, 2023, Defendants had not retained an expert in time to meet their corresponding deadline of November 20, 2023.  *See id.* at 1–2.  Ms. Levy agreed to a scheduling extension under which Defendants would serve their expert reports on January 5, 2024.  *Id.* at 2; ECF No. 151, at 1.  However, on December 28, 2023, Defendants informed Ms. Levy that they would not be able to meet the January 5 deadline.  ECF No. 152, at 2.  Ms. Levy agreed to an additional extension of the schedule, but the parties could not agree on a deadline for Defendants' expert reports: while Ms. Levy proposed March 8, 2024, Defendants responded that they could provide the report of one of their proposed experts by that date but would require until April 15, 2024, for completion of their second expert's report.  *Id.*  Ms. Levy's counsel stressed that "the Court's intervention [was] necessary . . . to ensure that there [would be] no further delay given the age of Ms. Levy's case and the ongoing distress and harms that she suffers due to her gender dysphoria."  *Id.* at 3.

On February 21, 2024, this case was referred to the undersigned for resolution of discovery disputes and related scheduling matters.  ECF No. 153.  On February 23, 2024, counsel for Defendants and Ms. Levy had a meet-and-confer call "to discuss outstanding issues, including the Department's plan for expert discovery."  ECF No. 179, at 5–6.  One week prior to the call, Defendants had disclosed their experts as Dr. Joel Andrade, Ph.D., a social worker, and Dr. Joseph Penn, M.D., a psychiatrist.  *See* ECF No. 168-1, at 4–5; ECF No. 168-2, at 1.  During the call, Defendants' counsel indicated that they might also retain a psychologist, ECF No. 179-1, at 2, and that Defendants were investigating "whether [their] experts want[ed] to examine" Ms. Levy, ECF No. 168-4, at 1.  After identifying some general examination topics, Defendants' counsel stated

that they would provide Ms. Levy's counsel with a list of specific topics and then both parties could discuss. *See id.*; ECF No. 179, at 6.  Ms. Levy's counsel responded that if Defendants' experts wanted to conduct an independent medical examination ("IME") of Ms. Levy, he was "open to arranging it by stipulation," but he did not agree to any examinations and Defendants' counsel did not confirm whether either Dr. Andrade or Dr. Penn would conduct an IME.  ECF No. 179, at 6; *see* ECF No. 168-4, at 1.  Ms. Levy's counsel also "raised concerns" about Dr. Penn's and Dr. Andrade's qualifications.  ECF No. 179-1, at 2.

The Court held a hearing regarding the parties' expert discovery dispute on March 1, 2024. ECF No. 157, at 1.  During the hearing, Defendants' counsel stated that in addition to Dr. Andrade and Dr. Penn, they were planning to retain Dr. Sara Boyd, Ph.D., a clinical psychologist.  ECF No. 178, at 19–22.  The Court granted Defendants' request to set April 15, 2024, as the deadline for serving their expert reports, *id.* at 38; ECF No. 157, at 1, but stated that given the history of delays and extensions in the case, there would be "no further extensions," ECF No. 178, at 24; *see id.* at 5–6.  Additionally, the parties agreed that before any of Defendants' experts conducted a medical examination of Ms. Levy, they would meet and confer to reach agreement about the scope of the examination.  ECF No. 178, at 49.

On March 14, 2024, Defendants' counsel informed Ms. Levy's counsel that Defendants were retaining Dr. Boyd to perform an IME of Ms. Levy.  ECF No. 179-3, at 2.  Defendants' counsel proposed three dates for Dr. Boyd's IME, *id.*, and less than an hour later, provided the scope and estimated length of Dr. Boyd's examination, ECF No. 168-13, at 2–3.  Ms. Levy's counsel responded with a draft stipulation, which Defendants' counsel authorized Ms. Levy's counsel to sign on Defendants' behalf and file for the Court's approval.  *See id.* at 1–2.  On March 18, 2024, the parties filed a Stipulation for Entry of Order Allowing Rule 35 Examination, which

set forth the date, time, location, length, and scope of Dr. Boyd's IME, and imposed additional parameters and safeguards, *see* ECF No. 160, at 1–2, including that Dr. Boyd would conduct her examination in a trans-affirmative manner — meaning that she would "respect Ms. Levy's gender identity by using female pronouns" — and that the examination would be audio recorded, *id.* at 2. The Court approved the stipulation on March 18, 2024.  ECF No. 161.

On April 10, 2024, Ms. Levy's counsel had a call with Ms. Levy, during which they learned that shortly after Dr. Boyd's IME, Dr. Penn conducted an IME of Ms. Levy.  ECF No. 179, at 8. Ms. Levy told her counsel that "she was surprised and confused" by Dr. Penn's examination but assumed her counsel had coordinated with Defendants and approved the examination, and she "recognized that refusing to participate in the exam could have dire consequences for her case." *Id.*  Ms. Levy also told her counsel that "she was distressed by some of the questions Dr. Penn asked." *Id.*

"[I]mmediately" after the call, Ms. Levy's counsel contacted Defendants' counsel via email to confirm that Dr. Penn had conducted an IME of Ms. Levy.  *Id.*; ECF No. 179-4, at 3.  Defendants' counsel confirmed that Dr. Penn met with Ms. Levy over two sessions of approximately two hours each on March 29 and April 1, 2024.  ECF No. 179-4, at 2.  Defendants' counsel then sent an email taking responsibility for the "error" — they mistakenly believed that the parties had agreed upon the scope of Dr. Penn's IME and that Ms. Levy's counsel were aware of the dates and times of the examination, but after reviewing "emails and documents" in the case, they realized that no such agreement had been made or notice given.  ECF No. 168-7, at 1; *see also* ECF No. 168-1, at 7–8. Defendants' counsel also informed Ms. Levy's counsel that Dr. Penn's examination had not been recorded.  ECF No. 168-7, at 1.  The following morning, Defendants' counsel and Ms. Levy's counsel met via video conference, during which Defendants' counsel again "acknowledged that

[they] had not received authorization for Dr. Penn's exam." ECF No. 179, at 8. As a remedy, Defendants' counsel offered to provide Ms. Levy's counsel with Dr. Penn's notes or strike portions of his report. *Id.*; ECF No. 168-6, at 3. Ms. Levy's counsel responded that striking only parts of Dr. Penn's report "would be impracticable and would not address the prejudice from the unauthorized exam." ECF No. 179, at 8. Defendants' counsel stated that if the parties could not come to an agreement regarding Dr. Penn, they would litigate the issue. *Id.*

On April 11, 2024, after Defendants reconfirmed that they intended to rely on Dr. Penn and his opinions, Ms. Levy's counsel initiated the Court's discovery dispute resolution process. *See id.* at 8–9; ECF No. 162. Pursuant to the Court's procedures, Ms. Levy filed a letter brief on April 19, 2024, ECF No. 165, as did Defendants, ECF No. 166. In her letter brief, Ms. Levy argued that Dr. Penn's unauthorized IME violated both Federal Rule of Civil Procedure 35 ("Rule 35") and Maryland Rule of Professional Conduct 4.2 ("Rule 4.2"), and the only redress for these violations was for the Court to "strike Dr. Penn's report and prohibit him from serving as an expert." ECF No. 165, at 1. Defendants, in their letter brief, conceded that they had made a mistake but argued that the "drastic measure of preclusion is not the appropriate remedy." ECF No. 166, at 1. Without addressing the alleged violation of Rule 4.2, Defendants argued that they could establish the requirements for a Rule 35 order and would move for such an order "to permit the forensic examination of Ms. Levy by Dr. Penn, *nunc pro tunc*." *Id.* at 2.

On April 30, 2024, Defendants filed a Motion for an Independent Medical Examination *Nunc Pro Tunc*. ECF No. 168. Although filed as an independent Motion, much of the substance of the Motion overlaps with the previous discovery dispute pursuant to which the parties had filed letter briefs consistent with the Court's Order on discovery disputes. *See* ECF No. 156, at 1–2; ECF Nos. 165, 166. Defendants purported to bring their Motion pursuant to Rules 6(b)(1)(B) and

35 of the Federal Rules of Civil Procedure and sought an order retroactively authorizing Dr. Penn's examination of Ms. Levy on March 29 and April 1, 2024.  ECF No. 168, at 1.  Alternatively, Defendants requested that the Court allow Dr. Penn "to issue an amended report based upon his review of the entire record in this case," excluding any conclusions drawn from the examination. ECF No. 168-1, at 29.  As a final alternative, Defendants proposed that the Court permit Dr. Penn to "conduct another IME consistent with any stipulation and court order that the parties would craft."  *Id.*  Ms. Levy, after seeking leave of the Court, ECF No. 173, filed a Response in Opposition to Defendants' Motion on May 15, 2024, ECF No. 179, to which Defendants filed a Reply on June 3, 2024, ECF No. 184.

**LEGAL STANDARD**

Defendants argue that the Court can resolve the current discovery dispute by granting their post-hoc motion for an independent medical examination under Federal Rule of Civil Procedure 35.  ECF No. 168; *see* ECF No. 184, at 2.  Under Federal Rule of Civil Procedure 35(a), a court may order the physical or mental examination of a party where there is good cause for the examination and the party's physical or mental condition is in controversy.  Fed. R. Civ. P. 35(a); *see, e.g.*, *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964).  The Fourth Circuit has explained that "the invasion of [an] individual's privacy by a physical or mental examination" under Rule 35 "is so serious that a strict standard of good cause, supervised by the district courts, is manifestly appropriate."  *Guilford Nat'l Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962). Parties, upon agreement, can also arrange for independent physical or mental examinations without a court order.  *See, e.g.*, *Chastain v. Evennou*, 35 F.R.D. 350, 353 (D. Utah 1964).

Defendants purport to bring their Motion pursuant to Federal Rule of Civil Procedure 6(b)(1)(B) ("Rule 6(b)(1)(B)"), which generally governs motions to extend time after court

deadlines have run. *See, e.g.*, *Propps v. Kirkpatrick*, No. SAG-21-1744, 2022 WL 991397, at *2 (D. Md. Apr. 1, 2022). Under Rule 6(b)(1)(B), "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). To determine whether a party's neglect is "excusable," courts conduct an "equitable [inquiry]" that "tak[es] account of all relevant circumstances," including "the danger of prejudice to the [non-movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 533 (4th Cir. 1996) (first and third alterations in original) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 395 (1993)).[1] However, "'[e]xcusable neglect' is not easily demonstrated," and courts have generally held that "a mere concession of palpable oversight or administrative failure . . . fall[s] short of the necessary showing." *Id.* at 534 (emphasis omitted) (quoting *In re O.P.M. Leasing Servs., Inc.*, 769 F.2d 911, 917 (2d Cir. 1985), *superseded by statute on other grounds*, Fed. R. App. P. 4(a)(6), *as recognized in In re WorldCom, Inc.*, 708 F.3d 327 (2d Cir. 2013)). Accordingly, "a district court should find excusable neglect only in the *extraordinary cases* where injustice would otherwise result." *Ward v. Branch Banking & Tr. Co.*, No. ELH-13-1968, 2016 WL 4492706, at *5 (D. Md. Aug. 25, 2016) (quoting *Thompson*, 76 F.3d at 534); *see also Smith v. Look Cycle USA*, 933 F. Supp. 2d 787, 791 (E.D. Va. 2013) ("This [excusable neglect] standard is a very high bar, applicable to only the extraordinary cases where injustice would

---

[1] Although the court in *Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530 (4th Cir. 1996), interpreted "excusable neglect" under Rule 4(a) of the Federal Rules of Appellate Procedure, *see id.* at 532, 534, courts have found "[e]xcusable neglect . . . to have the same meaning throughout the Federal Rules of Civil[,] Appellate and Bankruptcy Procedure," *Moussavi v. JP Morgan Chase Bank, N.A.*, No. GJH-15-2094, 2017 WL 1314110, at *2 n.4 (D. Md. Apr. 6, 2017).

otherwise result." (citing *Bredell v. Kempthorne*, 290 F. App'x 564, 565 (4th Cir. 2008) (per curiam))).

District courts enjoy "substantial discretion in managing discovery." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 929 (4th Cir. 1995). Accordingly, district courts possess inherent authority to impose sanctions for "discovery abuses." *Mey v. Phillips*, 71 F.4th 203, 217 (4th Cir. 2023); *see also Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 375 (4th Cir. 2013) ("[A] court acting under its inherent authority may impose sanctions for any 'conduct utterly inconsistent with the orderly administration of justice.'" (quoting *United States v. Nat'l Med. Enters., Inc.*, 792 F.2d 906, 912 (9th Cir. 1986))).

## ANALYSIS

While Defendants concede that they erred in permitting Dr. Penn's unauthorized examination of Ms. Levy, they argue that striking Dr. Penn and his opinions is both unwarranted and antithetical to the interests of justice. *See* ECF No. 168-1, at 2–4. Specifically, Defendants claim that there is no evidence in the record that Ms. Levy suffered any actual prejudice as a result of Dr. Penn's examination. *Id.* at 22. Defendants relatedly argue that Dr. Penn's examination did not exceed the general scope Defendants' counsel provided during the February 23 meet-and-confer call, *see id.* at 16, was not any more invasive than the examinations conducted by the other experts in this case,[2] *see id.* at 23, and satisfies the "good cause" and "in controversy" requirements of Federal Rule of Civil Procedure 35(a), *see id.* at 18–21. Additionally, Defendants argue that their error constitutes excusable neglect and that the balance of equities weighs in favor of allowing

---

[2] Ms. Levy's counsel retained two experts — Dr. Randi Ettner, Ph.D., a clinical and forensic psychologist, and Dr. Ryan Nicholas Gorton, M.D., a physician — both of whom conducted IMEs of Ms. Levy. *See* ECF No. 179, at 22–23; ECF No. 168-11, at 1; ECF No. 168-12, at 1–2.

Dr. Penn to remain as an expert, citing their diligence and good faith as well as the benefit to the Court of having a full record. *See id.* at 21–28.

Defendants argue that their current Motion is sufficient to redress their error and thus ask the Court to retroactively authorize the examination Dr. Penn conducted on March 29 and April 1, 2024, pursuant to the doctrine of *nunc pro tunc*. *See id.* at 29; ECF No. 184, at 2. If the Court will not retroactively authorize Dr. Penn's examination, Defendants request that the Court allow Dr. Penn to submit "an amended report based upon his review of the entire record in this case." ECF No. 168-1, at 29. Alternatively, Defendants ask the Court to allow Dr. Penn to conduct another examination of Ms. Levy "consistent with any stipulation and court order that the parties would craft." *Id.*

Ms. Levy argues that the only appropriate remedy is to strike Dr. Penn as an expert. *See* ECF No. 179, at 14. Because Defendants never confirmed that Dr. Penn would be examining Ms. Levy and, consequently, the parties never agreed upon the terms of such examination, Ms. Levy claims that Dr. Penn's unauthorized examination not only contravened Federal Rule of Civil Procedure 35, but also violated Maryland Rule of Professional Conduct 4.2, which prohibits *ex parte* contacts between an attorney and a represented party regarding the subject of the representation. *See id.* at 1, 9; Md. Att'ys' Rules of Pro. Conduct r. 19-304.2(a). Ms. Levy argues that deterring such violations is critical to "the integrity of the justice system," *id.* at 14 (quoting *Camden v. Maryland*, 910 F. Supp. 1115, 1123 (D. Md. 1996)), and that Dr. Penn's unauthorized examination caused her personal distress as well as prejudice, *see id.* at 8, 27–28. Striking only portions of Dr. Penn's report would not eliminate this prejudice and is impractical, according to Ms. Levy, because Dr. Penn's "opinions are inextricably bound up with what he perceived about Ms. Levy and learned from his exam of her." *Id.* at 15. Since Dr. Penn cannot unlearn the

information he obtained, Ms. Levy claims that permitting him to conduct a second examination is a similarly inadequate remedy.  *See id.* at 16.  Finally, Ms. Levy argues that Dr. Penn's examination does not satisfy the requirements of Rule 35, *see id.* at 18–19, but even if it did, Defendants cannot obtain retroactive authorization for Dr. Penn's examination by "belatedly litigat[ing] a Rule 35 motion [they] never made," *id.* at 17.   Ms. Levy adds that Federal Rule of Civil Procedure 6(b)(1)(B) is inapplicable because the crux of the present dispute is not an issue of "delay or the expiration of time" but rather "nonfeasance."  *Id.* at 25.

The Court addresses each proposed remedy in turn below.

## I.     Authorizing Dr. Penn's Examination of Ms. Levy on March 29 and April 1, 2024, *Nunc Pro Tunc*

The purpose of a *nunc pro tunc*, or "now for then," order "is to correct mistakes or omissions in the record so that the record properly reflects the events that *actually took place*." *Glynne v. Wilmed Healthcare*, 699 F.3d 380, 383–84 (4th Cir. 2012).  A *nunc pro tunc* order thus "presupposes a decree allowed, or ordered, but not entered, through inadvertence of the court."  *In re Grinding Specialists, LLC*, 625 B.R. 6, 14 (Bankr. D.S.C. 2021) (quoting *Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano*, 589 U.S. 57, 65 (2020)).  The "narrow confines of the doctrine are widely recognized," and *nunc pro tunc* orders cannot be used to "retroactively record an event that never occurred."  *Glynne*, 699 F.3d at 384.  While the doctrine does not necessarily "prohibit[] . . . all retroactive relief in all instances," federal courts do not have authority "to grant retroactive relief by *nunc pro tunc* orders which purport to create facts or rewrite history to support the retroactive relief granted."  *In re Grinding Specialists*, 625 B.R. at 14 (quoting *In re Miller*, 620 B.R. 637, 641 (Bankr. E.D. Cal. 2020)).

Defendants provide no authority supporting the use of a *nunc pro tunc* order to retroactively authorize Dr. Penn's IME of Ms. Levy.  None of the cases Defendants cite in their Memorandum

in support of their Motion utilize or discuss the doctrine of *nunc pro tunc*.  In their Reply brief, Defendants cite two cases in support of their claim that "Rule 6(b)(1)(B) may be used as a statutory basis for the common law notion of *nunc pro tunc*."  ECF No. 184, at 9 (citing *Mook v. Gertsema*, No. 07-2152-CM, 2008 WL 2859169 (D. Kan. July 23, 2008);[3] *Yahoo, Inc. v. Nakchan*, No. 08 Civ. 4581, 2011 WL 666678 (S.D.N.Y. Feb. 22, 2011)).  In both of these cases, the courts granted the defendants' motions for extensions of time to file their answers *nunc pro tunc*.  *See Mook*, 2008 WL 2859169, at *1–2; *Yahoo*, 2011 WL 666678, at *3.  Neither decision discussed the doctrine of *nunc pro tunc*, and critically, neither court used the doctrine to retroactively authorize an act the defendants had already performed.[4]

Ms. Levy argues that Defendants' request for retroactive authorization of Dr. Penn's examination is not the "proper office of a *nunc pro tunc* order."  ECF No. 179, at 17 (emphasis added) (quoting *Glynne*, 699 F.3d at 384).  Because Defendants did not seek permission for Dr. Penn's examination before he conducted it, Ms. Levy claims that to grant such permission now is

---

[3] Defendants directly cite *Terry v. Swift Transportation*, No. 1:16cv256, 2017 WL 4236923 (M.D.N.C. Sept. 22, 2017), which in turn cites *Mook v. Gertsema*, No. 07-2152-CM, 2008 WL 2859169 (D. Kan. July 23, 2008), for the proposition that a court can set aside a default judgment for good cause shown.  *Terry*, 2017 WL 4236923, at *3.  *Terry* did not involve a motion or order *nunc pro tunc* and did not address or discuss the doctrine.

[4] Defendants proceed to argue that their failure to obtain permission for Dr. Penn's examination constitutes excusable neglect under Federal Rule of Civil Procedure 6(b)(1)(B).  *See* ECF No. 168-1, at 21.  Rule 6(b)(1)(B) authorizes courts to retroactively extend deadlines.  *See, e.g.*, *Ali v. Carnegie Inst. of Wash.*, 309 F.R.D. 77, 81–82 (D.D.C. 2015).  However, since Federal Rule of Civil Procedure 35 requires that a court order or agreement of the parties precede an IME, *see, e.g.*, *Smith v. Bd. of Governors of the Univ. of N.C.*, No. 7:08-CV-30D, 2008 WL 4877131, at *2 (E.D.N.C. Nov. 10, 2008) ("A lack of consent [to an independent medical examination] makes a court order a procedural necessity . . . ."), the Court cannot, by extending the deadline for Defendants' Rule 35 motion, thereby sweep in Dr. Penn's already conducted examination.  Thus, Rule 6(b)(1)(B) is inapplicable to Defendants' request for retroactive authorization of Dr. Penn's examination of Ms. Levy.

tantamount to rewriting history.  *See id.*  Indeed, courts in the Fourth Circuit have routinely held that the doctrine of *nunc pro tunc* cannot be used to retroactively record events that never occurred.  *See, e.g.*, *Russe v. USP-Pruitt Holdings, Inc.*, No. 5:22-CV-103-BO, 2022 WL 4232508, at *1 (E.D.N.C. Aug. 9, 2022) (holding that "the *nunc pro tunc* doctrine [did] not extend" to plaintiff's counsel's unsuccessful attempt to upload plaintiff's complaint on the required date, and thus denying plaintiff's motion to file the complaint *nunc pro tunc*); *In re Grinding Specialists*, 625 B.R. at 15 (holding, in bankruptcy case, that court had "no liberty" under doctrine of *nunc pro tunc* to approve employment of counsel at a time preceding the date of the motion requesting such approval); *McNeill v. Hinson*, No. 3:18-cv-00189-MR, 2020 WL 8617627, at *1 (W.D.N.C. Dec. 8, 2020) (holding that court could not "*nunc pro tunc* order that [defendants' answer] was filed on some day before the deadline expired, when it was not in fact so filed" (emphasis added)); *Z.G. v. Pamlico Cnty. Pub. Schs. Bd. of Educ.*, No. 4:15-CV-183-D, 2019 WL 7987816, at *3 (E.D.N.C. Dec. 2, 2019) (holding that court could not use the doctrine of *nunc pro tunc* to "enter [p]laintiffs' documents as if they were filed on dates when they were not"); *Gleason v. Pearson*, No. 7:12CV00619, 2013 WL 2086251, at *1 (W.D. Va. May 14, 2013) (denying attorney's motion to appoint counsel *nunc pro tunc*, through which attorney sought compensation for litigating his previous unsuccessful motion to appoint counsel).

In addition to the considerable weight of authority against using the doctrine of *nunc pro tunc* in the manner Defendants request, it would be improper for this Court to retroactively authorize Dr. Penn's examination.  To start, Defendants did not, contrary to their commitment on the record, *see* ECF No. 178, at 49, reach an agreement with Ms. Levy's counsel regarding the terms of Dr. Penn's examination.  Prior to Dr. Boyd's examination, Defendants agreed to certain parameters and safeguards that Ms. Levy's counsel had requested, including that Dr. Boyd would

conduct her examination in a trans-affirmative manner and that the examination would be audio recorded.  ECF No. 160, at 2.  Defendants did not give Ms. Levy's counsel the opportunity to request such safeguards prior to Dr. Penn's examination, and the Court, by granting Defendants' requested relief, would be authorizing an examination that was conducted solely on Defendants' terms.[5]

Additionally, by retroactively authorizing Dr. Penn's examination, the Court would be sanctioning a clear violation of Maryland Rule of Professional Conduct 4.2.  Defendants claim that Rule 4.2 is inapplicable because Dr. Penn is not a lawyer and "an IME is not an adversarial process."  ECF No. 184, at 4.  While Dr. Penn is not bound by Maryland's Rules of Professional Conduct for attorneys, Defendants' counsel are, and they violated Rule 4.2 by permitting — or failing to prevent — their retained expert's examination of Ms. Levy without her counsel's consent.  *See* ABA Comm. on Ethics & Pro. Resp., Formal Op. 95-396, at 2, 18–19 (1995); *Brown & Sturm v. Frederick Rd. Ltd.*, 768 A.2d 62, 78 (Md. Ct. Spec. App. 2001) ("Maryland has . . . substantially adopted the ABA Model Rules into the Maryland Rules of Professional Conduct, . . . and the ABA's opinions regarding the Model Rules, though not binding, are highly persuasive authority in Maryland courts." (internal citation omitted) (citing *Att'y Grievance Comm'n v. Gregory*, 536 A.2d 646, 651 (Md. 1988))).  Numerous decisions from other courts have found that

---

[5] Defendants, relying on select case law, claim that a recording of the examination is not required or "supported by relevant case law," ECF No. 168-1, at 13, and imply that, consequently, it is of no matter that Dr. Penn's examination was not recorded, *see id.* at 13–14; ECF No. 184, at 8–9. Yet Defendants had agreed to allow an audio recording of Dr. Boyd's examination, *see* ECF No. 160, at 2, and were thus on notice that Ms. Levy's counsel would likely request that any other IME be recorded as well.  Fundamentally, if Defendants had any issue with Dr. Penn's examination being recorded, Ms. Levy's counsel was entitled to the opportunity to show good cause for the recording.  *See, e.g.*, *Wright v. Hobby Lobby Stores, Inc.*, 344 F.R.D. 538, 541–42 (D. Colo. Aug. 7, 2023) (explaining that "Rule 35(a) clearly contemplates the imposition of conditions upon an examination," *id.* at 541, and permitting audio recording of an examination where plaintiff had provided "at least one valid reason why recording of the test [was] important," *id.* at 542).

lawyers violated analogous rules prohibiting *ex parte* communications where their retained experts interviewed represented parties without consent. *See, e.g.*, *Coleman v. Brown*, 938 F. Supp. 2d 955, 963–66, 968 (E.D. Cal. 2013); *United States v. Sierra Pac. Indus.*, 857 F. Supp. 2d 975, 977–79, 984 (E.D. Cal. 2011); *Awan v. Awan*, 906 N.Y.S.2d 70, 72 (Sup. Ct. 2010); *Commonwealth v. Louhisdon*, No. CIV.A. 01-201-B, 2001 WL 360047, at *1, *4 (Mass. Super. Ct. Mar. 29, 2001); *In re Katrina W.*, 37 Cal. Rptr. 2d 7, 9–11 (Ct. App. 1994). Further, although an IME may not in itself be adversarial, courts have recognized that "a compulsory Rule 35 examination . . . is 'a procedure embedded in the fundamental adversarial nature of litigation.'" *Wright v. Hobby Lobby Stores, Inc.*, 344 F.R.D. 538, 542 (D. Colo. Aug. 7, 2023) (quoting *Davanzo v. Carnival Cruise Lines*, No. 14-20153-CIV, 2014 WL 1385729, at *2 (S.D. Fla. Apr. 9, 2014)).[6] While Defendants raise questions as to whether their error was intentional and thus merits discipline, *see* ECF No. 184, at 3–4, their subsequent attempt to minimize and seek retroactive approval of the violation calls into question their intentionality, as well.

Finally, despite Defendants' disregard, the Court takes seriously the impact on Ms. Levy of Dr. Penn's unauthorized examination. While Defendants cite Ms. Levy's restricted freedom as an incarcerated person in downplaying any detrimental impact of Dr. Penn's unannounced examination, *see, e.g.*, ECF No. 168-1, at 22 ("The remote examination, which was broken into two separate sessions, took four hours of Ms. Levy's time over the course of two days. The examination has not affected her day-to-day activities as an incarcerated person." (internal citation

---

[6] Defendants also claim that resolution of their Motion "does not call for a sanction for any ethical violation, but an application of the Federal Rules of Civil Procedure pursuant to which Defendants' Motion is brought, Rules 35 and 6(b)(1)(B)." ECF No. 184, at 2. Defendants' argument seems to miss the point of the present dispute. The Court cannot, through the Federal Rules of Civil Procedure or any other mechanism, give Defendants consent they never had and thereby cure their violation of Rule 4.2.

omitted)), Ms. Levy is not without rights, and she was entitled to advance notice before being subjected to an invasive examination, *cf. Rich v. Diana Consulting Servs. LLC*, No. SAG-21-1670, 2022 WL 1289663, at *3 (D. Md. Apr. 29, 2022) ("[G]iven the potentially serious invasion of privacy called for by a mental or physical examination, Rule 35 includes express limitations on compelling an individual to submit to such examinations for discovery purposes.").  In fact, that the examination occurred in the correctional context heightens as opposed to lessens the concern. Ms. Levy's incarceration facilitated the violation that occurred in this case, as Defendants knew precisely where she would be, controlled her movement, and limited her access to contact and information that would have allowed her to confirm whether her counsel had agreed to Dr. Penn's examination.  While these realities are a necessary fact of life for incarcerated persons, their exploitation by an opposing party in litigation is not justified and, in fact, raises additional concern. For all these reasons, the Court cannot approve Defendants' infringement on Ms. Levy's rights.

For the foregoing reasons, the Court denies Defendants' request for retroactive authorization of Dr. Penn's examination of Ms. Levy on March 29 and April 1, 2024, and prohibits Defendants from using any information Dr. Penn obtained during that examination.

## II.       Permitting Dr. Penn to Submit an Amended Report

Since Defendants cannot use any information obtained from Dr. Penn's unauthorized examination of Ms. Levy, the Court turns to their second proposed remedy, which is to permit Dr. Penn to submit an amended report "based upon his review of the entire record in this case."  ECF No. 168-1, at 29.  Ms. Levy argues that this proposition is both impractical and inadequate to address the prejudice caused by Dr. Penn's unauthorized examination. *See* ECF No. 179, at 15–16.  Specifically, Ms. Levy claims that Dr. Penn's "opinions are inextricably bound up with what he perceived about [her] and learned from his exam of her." *Id.* at 15.  According to Ms. Levy, Dr.

Penn cannot now "isolate[]" his examination of her or "make himself forget what he learned," and consequently, any subsequent opinion Dr. Penn might offer would "inevitably be colored by the four hours he spent examining Ms. Levy." *Id.* at 16.

To start, Dr. Penn's unauthorized examination of Ms. Levy was inherently prejudicial to her. Because of the innately invasive nature of an IME in the litigation context, Rule 35 expressly anticipates the imposition of conditions on such examinations. *See Guilford*, 297 F.2d at 924 (explaining that Rule 35 requires a "strict standard of good cause" because "the invasion of the individual's privacy by a physical or mental examination is so serious"); *Wright*, 344 F.R.D. at 541 ("Rule 35(a) clearly contemplates the imposition of conditions upon an examination."); *Rich*, 2022 WL 1289663, at *3 (noting the "potentially serious invasion of privacy called for by a mental or physical examination" under Rule 35). Yet Ms. Levy's counsel had no opportunity to impose any safeguards on Dr. Penn's examination, the purpose of which, moreover, was to establish that gender confirmation surgery is not medically necessary to treat Ms. Levy's gender dysphoria. The information gained and conclusions drawn from Dr. Penn's unauthorized examination "are being presented in an adversarial litigation context, against the interest" of Ms. Levy, *Coleman*, 938 F. Supp. 2d at 966, to argue that Defendants have no obligation to provide the relief she seeks.

The Court agrees with Ms. Levy that permitting Dr. Penn to submit an amended report is inadequate to eliminate the prejudice caused by Defendants' ethical and procedural violations. The Court cannot plausibly strike only the portions of Dr. Penn's report that are based on his unauthorized examination, as it "cannot really know what portions of the report are dependent upon" the examination. *Id.* at 968. Likewise, Dr. Penn cannot now review the record in this case free from the knowledge he gained and impressions he formed during the examination, such that he could fully eliminate any prejudice by amending his report. Thus, the only sufficient remedy

is to strike Dr. Penn's report in its entirety. *See id.* (holding that it was "entirely proper" to strike expert reports that incorporated information from *ex parte* interviews with represented plaintiff class members); *see also Louhisdon*, 2001 WL 360047, at *4 (striking expert report arising out of unauthorized *ex parte* interview, since interviewee "would be substantially prejudiced if any factfinder were allowed to consider" it).

### III.   Permitting Dr. Penn to Conduct a Second IME of Ms. Levy

The final remedy Defendants propose is that the Court permit Dr. Penn to "conduct another IME consistent with any stipulation and court order that the parties would craft." ECF No. 168-1, at 29. Here, Defendants' proposition is best analyzed as an untimely request to extend their expert disclosure deadline. *Cf. Z.G.*, 2019 WL 7987816, at *3 (concluding that plaintiffs' motions *nunc pro tunc*, which effectively requested that the court backdate two of their filings, were "properly analyzed as untimely requests to extend deadlines"). To that end, Defendants argue that their failure to timely obtain permission for Dr. Penn's examination constitutes excusable neglect under Federal Rule of Civil Procedure 6(b)(1)(B), and that the balance of equities weighs in their favor. *See* ECF No. 168-1, at 21. While Defendants provide an analysis of the factors set forth in *Pioneer Investment Services Co. v. Brunswick Associates Ltd.*, 507 U.S. 380 (1993), for determining whether an omission constitutes excusable neglect, *see* ECF No. 168-1, at 22–28, most of their arguments are geared toward their request for retroactive authorization of Dr. Penn's examination.[7]

---

[7] Defendants cite one case, *A.T. v. Oley Valley School District*, No. 17-4983, 2019 WL 5862059 (E.D. Pa. Nov. 8, 2019), where a court ordered the plaintiff to appear for a second Rule 35 examination by the same examiner, *see* ECF No. 168-1, at 29 n.11 (citing *A.T.*, 2019 WL 5862059, at *3). As Ms. Levy notes, however, that case is "wholly distinguishable." ECF No. 179, at 16 n.5. Specifically, in *A.T.*, the plaintiff's counsel attended and interfered with the examination by frequently interrupting and "engag[ing] with [the examiner] in an antagonistic manner." *A.T.*, 2019 WL 5862059, at *3. Thus, the court concluded that a second examination was necessary to "remedy . . . the plaintiff's . . . wrongdoing," ECF No. 179, at 16 n.5; *see A.T.*, 2019 WL 5862059,

Thus, the Court will consider Defendants' arguments where applicable and relevant, but will analyze the balance of equities in light of their request for a second examination by Dr. Penn.

First, Ms. Levy has suffered unfair prejudice.  Defendants claim that there is no evidence in the record that Dr. Penn's unauthorized examination caused Ms. Levy any harm, and relatedly, that Ms. Levy has neither identified any aspect of Dr. Penn's examination that was unnecessary nor accused him of acting improperly.  *See id.* at 22.  Contrary to Defendants' assertions, the unauthorized examination was inherently and actually prejudicial to Ms. Levy.  For one, Ms. Levy had no advance notice of the examination, which "delved into highly private, emotional, and personal subject matter," ECF No. 179, at 27, and Ms. Levy claims that some of Dr. Penn's questions caused her distress, *id.* at 8.  Moreover, as discussed above, Defendants retained Dr. Penn for the express purpose of undermining Ms. Levy's claims, and Ms. Levy's counsel had no opportunity to impose any safeguards on the examination.  *See, e.g., Coleman*, 938 F. Supp. 2d at 964–65, 968 (explaining that defendants' claim that *ex parte* interviews were "harmless" was "plainly belied by the expert reports themselves, which directly use[d] the[] tainted interviews against the interviewees," *id.* at 968); *Louhisdon*, 2001 WL 360047, at *4 (finding, where expert had interviewed defendant without the knowledge or consent of defendant's counsel, that defendant "would be substantially prejudiced if any factfinder were allowed to consider the expert report . . . that constituted the fruits of this ethical violation").  A second examination cannot undo the distress that the unauthorized examination caused Ms. Levy, nor can it fully eliminate any prejudice to Ms. Levy's case, since, as discussed above, Dr. Penn cannot erase from his memory the knowledge he gained and conclusions he drew from the unauthorized examination.  *See* ECF

---

at *3–4, unlike here, where Defendants seek a second examination in an attempt to remedy their own misconduct.

No. 179, at 16.  On the contrary, granting Defendants' requested relief would exacerbate the harm to Ms. Levy by forcing her to undergo another invasive examination.  *Cf. Doe v. Sidar*, 93 F.4th 241, 245 (4th Cir. 2024) ("Orders compelling a party to submit to a physical or mental examination implicate serious privacy interests and cannot be undone later.").

Second, allowing Dr. Penn to conduct a second examination will further delay this already protracted litigation.  Defendants, in seeking retroactive authorization of the examination Dr. Penn conducted on March 29 and April 1, claim that there has been no delay, as they produced Dr. Penn's report by the extended deadline of April 15, 2024.  ECF No. 168-1, at 24.  Because Defendants did not have permission for Dr. Penn to conduct that examination, however, their argument on this point is irrelevant.  Permitting Dr. Penn to conduct a second examination would clearly cause delay, as the parties would need time to arrange the examination in accordance with Dr. Penn's and Ms. Levy's schedules, and Ms. Levy's counsel would then need to schedule and conduct a deposition of Dr. Penn, *see* ECF No. 152, at 3.  Thus, allowing Dr. Penn to perform a second examination would "compound[]" Defendants' "already-substantial delay in providing expert discovery."  ECF No. 179, at 28.

Third, the reason for the delay that would result from permitting Dr. Penn to conduct a second examination is Defendants' counsel's failure to comply with Federal Rule of Civil Procedure 35.  The reason for the delay is the "most important factor" in determining whether counsel's neglect is excusable, *Rothenberg v. Marriott Int'l, Inc.*, No. CCB-08-173, 2008 WL 687033, at *1 (D. Md. Feb. 29, 2008) (citing *Thompson*, 76 F.3d at 534), and "[m]ere inadvertence, without more, cannot be a sufficient ground for finding excusable neglect," *id.*; *see also, e.g.*, *Agnew v. United Leasing Corp.*, 680 F. App'x 149, 155 (4th Cir. 2017) (holding that appellants failed to demonstrate excusable neglect where only explanation appellants' counsel provided for

failure to timely file brief was that he mistakenly put the wrong date on his calendar, as "'run-of-the-mill inattentiveness by counsel' is not excusable neglect" (quoting *Thompson*, 76 F.3d at 535)). Yet, according to Defendants, inadvertence is the sole reason for their noncompliance.  *See* ECF No. 168-6, at 3 (stating that Defendants' counsel mistakenly believed that the parties had agreed on the terms of Dr. Penn's examination).  In a sealed Declaration, Defendants' counsel offer an explanation for the error, which they argue "qualifies as an 'exceptional circumstance.'"  ECF No. 184, at 11.  Defendants' argument, however, conflates this Court's recognition that "a district court should find excusable neglect only in the *extraordinary cases where injustice would otherwise result*," *Ward*, 2016 WL 4492706, at *5 (quoting *Thompson*, 76 F.3d at 534) (emphasis added), with the proposition that "exceptional circumstances" may justify counsel's error, *see* ECF No. 184, at 12.  While the Court is certainly sympathetic to the reason underlying Defendants' counsel's error, it "does not turn this case into . . . one . . . in which injustice would result without relief," *Ward*, 2016 WL 4492706, at *6; *see id.* at *4–6 (finding that plaintiffs failed to demonstrate excusable neglect to justify an extension of time to appeal, even though plaintiffs alleged that they missed deadline due to "significant emotional stress that prevented them from functioning at full capacity," *id.* at *4), particularly in light of the significant harm that would result to Ms. Levy if Dr. Penn were allowed to conduct a second examination.[8]  Moreover, Defendants can still rely on Dr. Boyd's expert report, which addresses many of the same topics as Dr. Penn's.  *Compare* ECF No. 168-5, at 1–2 (opining on Ms. Levy's mental state, whether gender dysphoria will improve with surgery, the impact of Ms. Levy's gender dysphoria on her mental state, and Ms. Levy's

---

[8] The Court recognizes the reality that all individuals, including the undersigned, make errors. While the Court agrees that all individuals deserve sympathy and forgiveness — no matter how large or small their errors may be — the proper remedy for such errors is not to harm the victims of such errors.

capacity to understand the benefits and risks of gender confirmation surgery), *with* ECF No. 168-3, at 1–3 (opining on whether gender confirmation surgery is medically necessary and clinically indicated and Ms. Levy's capacity to understand the benefits and risks of such surgery).  Contrary to Defendants' characterization, this is not a case in which the Court would be left "to rule on this deeply complicated issue without any factual record at all."  ECF No. 168-1, at 20 (quoting *Zayre-Brown v. N.C. Dep't of Pub. Safety*, No. 3:22-cv-191-MOC-DCK, 2022 WL 4456268, at *5 (W.D.N.C. Sept. 23, 2022)).

Fourth, Defendants have not acted completely in good faith.  Defendants claim that their "efforts to work cooperatively with [Ms. Levy's] counsel on the proposed examination by Dr. Boyd is illustrative of their pattern of good faith."  *Id.* at 26.  That Defendants complied with the Federal Rules of Civil Procedure and their ethical obligations with respect to Dr. Boyd's examination does not establish a "pattern of good faith."  On the contrary, Defendants established a pattern of failing to meet discovery deadlines without explanation.  *See* ECF No. 152, at 1–2; ECF No. 179, at 29.  For many courts, this would have been enough to bar the further addition of experts.  Nonetheless, giving credence to many of the same arguments which Defendants make in the present Motion, the Court extended the deadline for expert disclosures, despite Defendants' failure to timely disclose expert materials.  *See* ECF No. 178, at 5–6, 24–25, 38.  However, the Court warned that no further extensions would be granted.  *Id.* at 24.  As this Court has explained, "noncompliance [or] haphazard compliance . . . [with] discovery orders" can demonstrate bad faith, *LeCompte v. Manekin Constr., LLC*, 573 B.R. 187, 195 (D. Md. 2017) (alterations and omission in original) (quoting *Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 93 (4th Cir. 1989)), particularly where the party fails to provide a "satisfactory reason" for its noncompliance, *id.* (quoting *Aerodyne Sys. Eng'g, Ltd. v. Heritage Int'l Bank*, 115 F.R.D. 281, 290

(D. Md. 1987)).  Defendants additionally note that Ms. Levy signed a consent form prior to Dr. Penn's examination and provide a blank copy of this consent form as an exhibit.  *See* ECF No. 168-1, at 9; ECF No. 168-10.  The last page of the consent form requires a signature from the examinee's attorney certifying that the attorney has "explained [the] consent procedure to [their] client" and "answered any questions [their] client asked about the procedure."  ECF No. 168-10, at 3.  As Ms. Levy's counsel were not aware that Dr. Penn was conducting an examination of Ms. Levy, they could not have signed this form — yet Dr. Penn proceeded with the examination, without the requisite certification that Ms. Levy had consulted with her counsel.  Finally, Defendants' attempt to proceed with Dr. Penn, despite their awareness of the error that led to his examination, calls into question the degree of their recognition and contrition over their error.

Considering the factors above, the Court concludes that the balance of equities weighs against extending the expert discovery deadline to permit Dr. Penn to conduct a second examination of Ms. Levy.  Thus, the Court need not address whether Defendants have satisfied the requirements for an order compelling such examination under Federal Rule of Civil Procedure 35.

## IV.   Striking Dr. Penn as an Expert

In light of the foregoing discussion, the only appropriate remedy is that requested by Ms. Levy: to strike Dr. Penn as an expert and prohibit him from offering any opinions or testimony in this case.  Critically, because Dr. Penn cannot unlearn the information he gained, impressions he formed, and conclusions he drew from his unauthorized examination, no lesser remedy will sufficiently address the prejudice to Ms. Levy.  Indeed, numerous decisions from this court and other jurisdictions have concluded that the only adequate remedy for unauthorized *ex parte* communications was to strike the expert — or, where counsel made the improper contact, disqualify counsel — and exclude all evidence obtained from the communication.  *See, e.g.*,

*Coleman*, 938 F. Supp. 2d at 968 (striking defendants' expert reports and explaining that defendants could correct the problem only by "retaining untainted experts"); *Camden*, 910 F. Supp. at 1116, 1123–24 (excluding evidence and disqualifying counsel "because the knowledge they wrongly obtained can never be erased from their minds," *id.* at 1124); *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 753–55 (D. Md. 1997) (same); *Louhisdon*, 2001 WL 360047, at *4 (excluding expert's report and testimony because that was the "only . . . appropriate remedy that [could] place the respondent in the same position he would have been in had the ethical violation never occurred"); *see also Sanchez v. Los Lunas Pub. Schs.*, No. 35,068, 2016 WL 3429671, at *2 (N.M. Ct. App. May 4, 2016) (holding, in workers' compensation case, that where a doctor conducted an unauthorized IME of the worker, the doctor's "testimony and records should have been excluded").

Contrary to Defendants' assertion, this sanction is not "unwarranted, unnecessary, [or] unjust." ECF No. 168-1, at 29. Although Defendants claim that they "do not wish to make light of their error," ECF No. 166, at 3, they "persistently minimize[]" their misconduct and the consequent harm done to Ms. Levy, ECF No. 179, at 29; *see, e.g.*, ECF No. 168-1, at 22 (claiming that Dr. Penn's unauthorized examination did not harm or otherwise affect Ms. Levy because she "is in a carceral setting, serving a lengthy term of confinement"); ECF No. 184, at 2 (claiming that "the resolution of Defendants' Motion . . . does not call for a sanction for any ethical violation"). Additionally, while Defendants argue that the Department should not be penalized for their counsel's error, *see* ECF No. 168-1, at 26, the U.S. Supreme Court, in setting forth the factors for determining excusable neglect, "specifically observed that it was appropriate to hold a client accountable for the mistakes of counsel," *Thompson*, 76 F.3d at 533 (citing *Pioneer*, 507 U.S. at 396–97); *see also Gayle v. United Parcel Serv., Inc.*, 401 F.3d 222, 226 (4th Cir. 2005) (explaining that the Supreme Court and Fourth Circuit caselaw have "rejected such a distinction between the

conduct of attorneys and their clients").  Defendants also argue that there are "[a]dditional safeguards" — such as a deposition of Dr. Penn, cross-examination, and motions in limine — for Ms. Levy to challenge any opinion Dr. Penn might offer.  *See* ECF No. 168-1, at 14–15.  For the reasons discussed above, however, there are sufficient grounds to strike Dr. Penn as an expert now, and it would be not only counterproductive but also unfair to Ms. Levy to allow Dr. Penn to remain as an expert when he has been irrevocably "tainted," *Coleman*, 938 F. Supp. 2d at 968, by the unauthorized examination he performed.  Finally, allowing Dr. Penn to remain as an expert in this case would not, as Defendants claim, "promote the interests of justice."  ECF No. 168-1, at 3.  Rather, the "integrity of the justice system" would be "at risk" if the Court left Defendants' violations un-redressed and allowed them to use their "ill[-]gotten" gains against Ms. Levy.  *Camden*, 910 F. Supp. at 1123.  While the Court has an interest in ensuring that it has all the necessary information to make a decision, as Defendants repeatedly emphasize, *see, e.g.*, ECF No. 168-1, at 3, 20–21, 25, this cannot come at the cost of the Federal Rules of Civil Procedure.  Just as important as ensuring that the Court has all available information is guaranteeing that the information it receives has been produced subject to the rules that ensure its fairness and accuracy.  More information — if not created and produced subject to these rules — hurts more than it helps the Court.

Because there is no other remedy that can "place [Ms. Levy] in the same position [she] would have been in" had Defendants' ethical and procedural violations "never occurred," *Louhisdon*, 2001 WL 360047, at *4, the Court will exercise its inherent authority to strike Dr. Penn as an expert and preclude him from offering any opinions or testimony in this case.

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' Motion for an Independent Medical Examination *Nunc Pro Tunc*, ECF No. 168, strikes Dr. Penn's report and testimony, and precludes Dr. Penn from further participation in this case.

So ordered.

Date:  June 21, 2024

_____/s/_____
Ajmel A. Quereshi
U.S. Magistrate Judge